| | |
|---|---|
| C. BICKHAM DICKSON, III, ET AL : | NUMBER: *547558 · B* |
| : | |
| VERSUS : | FIRST JUDICIAL DISTRICT COURT |
| : | |
| SKLARCO L.L.C., ET AL : | CADDO PARISH, LOUISIANA |

### PETITION FOR DECLARATORY
### JUDGMENT AND ANCILLARY RELIEF

NOW INTO COURT come C. BICKHAM DICKSON, III; JAMES SCOTT DICKSON; DENISE MERRELL DICKSON; MICHAEL ROBERT DICKSON; and ADDIE SMITH DICKSON ("Petitioners"), who file their Petition for Declaratory Judgment and Ancillary Relief and respectfully represent, as follows:

1.

Made defendants herein are SKLARCO, L.L.C. ("Sklarco"), a Louisiana limited liability company, domiciled at 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101; and PETROHAWK PROPERTIES, L.P. ("Petrohawk"), a Texas limited partnership, domiciled at 1000 Louisiana, Suite 5600, Houston, Texas 77002.

2.

This dispute and proceeding arises from contracts executed in Caddo Parish, Louisiana affecting rights in lands and/or mineral rights located in Caddo and Bossier Parishes, Louisiana, and, accordingly, jurisdiction and venue are proper in Caddo Parish and as provided by La. Code Civ. P. arts. 8, 76.1 and 80.

3.

By Oil, Gas and Mineral Leases dated September 1, 2005, and recorded on December 14, 2005, in the Conveyance Records of Caddo Parish, Louisiana, Petitioners granted to Sklarco the right to explore for and produce oil, gas and other minerals for a primary term of three (3) years and covering the properties described in the exhibits annexed to those leases, comprising 1385.52 acres, more or less (the "Leases"). A copy of the Leases are attached hereto as Exhibit 1, *in globo*.

4.

By an Amendment and Extension of Oil, Gas and Mineral Leases dated effective July 1, 2008, and recorded on August 8, 2008, in the Conveyance Records of Caddo Parish, Louisiana,

**EXHIBIT**
**"1"**
in globo

Petitioners granted to Sklarco and Petrohawk an extension of the primary term of the Leases to August 31, 2011. A copy of the Lease Extension is attached hereto as Exhibit 2.

5.

The Lease Extension states, in relevant part only, that "by 'Partial Sublease of Oil, Gas and Mineral Leases' (the 'Sublease') dated effective February 1, 2008, a 'Memorandum' of which is recorded under Registry No. 2142878 of the Conveyance Records of Caddo Parish, Louisiana . . . [Sklarco] subleased to [Petrohawk] various oil, gas and mineral leases, including the [Leases] INSOFAR AND ONLY INSOFAR as said leases cover and affect those depths from and below the top of the Hosston Zone, Reservoir A, Cedar Grove Field, as defined by the Louisiana Office of Conservation Order No. 967, dated January 28, 1976 (the 'HOSSTON Zone'), and reserving unto [Sklarco] the rights of the lessee under the [Leases] insofar as they cover and affect those depths from the surface of the Earth to the top of the Hosston Zone . . ." and that the Petitioners "do hereby consent to the sublease of the [Leases] by [Sklarco] to [Petrohawk]."

6.

As signatories to the Lease Extension, Sklarco and Petrohawk have consented to and are bound by the terms of the Leases and Lease Extension.

7.

Exhibit B to the Leases provides, in relevant part only, that "post production costs may be deducted from [Petitioners'] share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under this Lease insofar and only insofar as such costs either enhance the value of the product being sold and the price obtained for such product or are required to make the product marketable."

8.

This provision was particularly negotiated between Petitioners and Sklarco for the purpose of excluding gathering services and fees from costs that may be deducted from the Petitioners' share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under the Leases.

9.

Sklarco has drilled wells on lands unitized with the properties covered by the Leases.

10.

As a result of production in the Cedar Grove Field, Sklarco incurred substantial costs in constructing gathering lines.

11.

Consistent with the language and intent of the Leases, Sklarco has not deducted gathering services and fees from the Petitioners' share of the proceeds attributable to Sklarco's sale of hydrocarbons produced from zones lying above the Hosston Zone.

12.

Petrohawk, like Sklarco, has drilled wells on lands unitized with the properties covered by the Leases.

13.

However, Petrohawk, despite being bound to the same Leases as Sklarco, has deducted gathering services and fees from the Petitioners' share of the proceeds attributable to Petrohawk's sale of hydrocarbons produced from the Haynesville Zone (lying beneath the Hosston Zone).

14.

Considering the relevant language of the Leases and the clear intent of the original parties to the Leases, Petrohawk's deduction for gathering services and fees constitutes a breach of the Leases.

15.

In accordance with the provisions of the Leases and applicable law, Petitioners gave Petrohawk written notice, *via* certified mail, on July 8, 2010 of Petitioners' demand for payment of the amounts improperly deducted from the royalties due on production from the wells attributable to gathering services and fees. A representative for Petrohawk signed for and accepted that mail. A copy of that demand letter and certified mail receipt are attached hereto as Exhibit 3.

16.

Petrohawk has refused to comply with Petitioners' demand and the terms of the Leases.

17.

For the foregoing reasons, Petitioners seek declaratory judgment declaring that the Leases exclude gathering services and fees from costs that may be deducted from the Petitioners' share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under the Leases.

18.

Petitioners further seek a judgment ordering Petrohawk to pay Petitioners any amounts previously deducted as gathering services and fees from Petitioners' royalty payments.

19.

Petitioners also seek any and all other equitable and ancillary relief to which they are entitled under the Leases and applicable law.

WHEREFORE, Petitioners respectfully pray as follows:

1.  For declaratory judgment in their favor and against Sklarco, L.L.C. and Petrohawk Properties, L.P. declaring that the Leases exclude gathering services and fees from costs that may be deducted from the Petitioners' share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under the Leases;

2.  For judgment in their favor and against Petrohawk ordering Petrohawk to pay Petitioners any amounts previously deducted as gathering services and fees from Petitioners' royalty payments; and

3.  For any and all equitable relief available to them under the terms and provisions of the Leases and in accordance with.

Shreveport, Louisiana, this _21st_ day of January, 2011.

BLANCHARD, WALKER, O'QUIN & ROBERTS
(A Professional Law Corporation)

By: _____

    Paul M. Adkins, Bar No. 14043
    Michael E. Riddick, Bar No. 14350
    John Andrew Durrett, Bar No. 28029

400 Chase Bank Tower, Suite 1400
Post Office Drawer 1126
Shreveport, Louisiana 71163-1126
Telephone: (318) 221-6858
Facsimile: (318) 227-2967

ATTORNEYS FOR PETITIONERS, C. BICKHAM
DICKSON, III; JAMES SCOTT DICKSON; DENISE
MERRELL DICKSON; MICHAEL ROBERT DICKSON;
and ADDIE SMITH DICKSON

**PLEASE SERVE:**

SKLARCO, L.L.C.,
through its registered agent for service of process:

Malcolm S. Murchison
401 Edwards Street, Suite 1000
Shreveport, Louisiana 71101

and

PETROHAWK PROPERTIES, L.P.,
through its registered agent for service of process:

National Registered Agents, Inc.
1011 N. Causeway Blvd., Suite 3
Mandeville, Louisiana 70471

ENDORSED FILED
COLVIN ROBERSON, Deputy Clerk

JAN 21 2011

CADDO PARISH DEPUTY CLERK

Gary Loftin
Caddo Parish Clerk of Court
**2011891**
12/14/2005   09:03 AM

OIL, GAS AND MINERAL LEASE

C 3817

WENDY CLARK
DEPUTY CLERK

THIS AGREEMENT made this 1st day of September, 2005, between

SUNFLOWER PLANTATION, L.L.C., a Louisiana limited liability company, whose mailing address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by all of the members of said limited liability company, being C. Bickham Dickson, Jr.; Caroline Haywood Dickson, represented herein by her Agent, C. Bickham Dickson, Jr., pursuant to that certain Power Of Attorney recorded under Registry No. 1955654 of the Records of Caddo Parish, Louisiana; C. Bickham Dickson, III; Michael Augustus Dickson; and James Scott Dickson;

C. BICKHAM DICKSON, JR., husband of Caroline Haywood Dickson, dealing herein with his separate property under his separate administration and control, who is a major resident of and domiciled in Caddo Parish, Louisiana, with mailing address at 4625 Fairfield Avenue, Shreveport, Louisiana 71106;

C. BICKHAM DICKSON, III, husband of Beverly Dorris Dickson, dealing herein with his separate property under his separate administration and control, who is a major resident of and domiciled in Caddo Parish, Louisiana, with mailing address at 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, who is appointed as Agent for all owners who are Lessor hereunder for purposes of receiving any and all notices delivered pursuant to this Lease;

MICHAEL AUGUSTUS DICKSON, husband of Martha Anne Smith Dickson, dealing herein with his separate property under his separate administration and control, who is a major resident of and domiciled in Caddo Parish, Louisiana, with mailing address at 728 Oneonta Street, Shreveport, Louisiana 71106; and

JAMES SCOTT DICKSON, husband of Rhonda Statham Dickson, dealing herein with his separate property under his separate administration and control, who is a major resident of and domiciled in Bossier Parish, Louisiana, with mailing address at 555 Sunflower Road, Bossier City, Louisiana 71112:

all above named parties hereinafter referred to as Lessor (whether one or more);

and SKLARCO L.L.C., Lessee, whose address is 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101;

WITNESSETH:

1. Lessor in consideration of One Hundred Dollars and Other Valuable Consideration ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulphur and all other minerals (including, without limitation, natural gas produced from coal or lignite seams), together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including operations hereunder or in connection with similar operations on adjoining land; the land to which this lease applies and which is affected hereby being situated in Bossier and Caddo Parishes, Louisiana, and described as follows, to-wit:

**See the attached Exhibit "A" for the description of lands covered by this lease.**

**See the attached Exhibit "B" for the additional provisions of this lease.**

This lease shall also extend and apply to any interest therein which Lessor may hereafter acquire by means other than a purchase, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes battures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above. Lessor agrees to execute any supplemental instrument requested by

**770**


EXHIBIT
1, ingbbo

lessee for a more complete or accurate description of said land. For the purposes of determining the amount of bonus and the shut-in royalty payment hereunder, said land shall be deemed to contain 798.438 acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2. Subject to the other provisions herein contained, this lease shall be for a period of three (3) years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-fifth (1/5) of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-fifth (1/5) of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-fifth (1/5) of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c) on all other minerals mined and marketed, one-fifth (1/5), either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to ten dollars (10.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation. If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year, not to exceed two (2) consecutive years, by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend Lessee's rights for one year. The annual payments herein provided for may be paid directly to Lessor's credit in accordance to the royalty division order attached as Exhibit "B" and made a part of the additional provisions of this lease and remain the basis for such annual payment regardless of any change or changes in the ownership of the land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of operations for the drilling of a well, or the completion of a well to the production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9.   Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods in a manner that is consistent with the surface use restrictions set forth in Exhibit "B" to this Lease.  All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent.  Subject to the surface use restrictions set forth in Exhibit "B", in exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances.  Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used.  Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing.  When required by Lessor, Lessee will bury all pipelines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor consent.  In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within three hundred thirty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10.  Subject to the Additional Provisions set forth in Exhibit "B" to this Lease, the rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee.  No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor.  An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease.  In addition, Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11.  In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment.  Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12.  In the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13.  When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation,

or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14.  Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15.  Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16.  Subject to the Additional Provisions in Exhibit "B" to this Lease, Lessor hereby warrants the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17.  This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:                          LESSOR:

                                    SUNFLOWER PLANTATION, L.L.C.
                                    a Louisiana limited liability company

                                    By: _____
                                        C. Bickham Dickson, Jr., Member

                                    By: _____
                                        C. Bickham Dickson, Jr., Agent
                                        for Caroline Haywood Dickson, Member

*[signatures]*

By: _[signature]_ C. Bickham Dickson, III
C. Bickham Dickson, III, Member

By: _[signature]_ Michael Augustus Dickson
Michael Augustus Dickson, Member

By: _[signature]_ James Scott Dickson
James Scott Dickson, Member

_[signature]_ C. Bickham Dickson Jr.
C. BICKHAM DICKSON, JR.

_[signature]_ C. Bickham Dickson III
C. BICKHAM DICKSON, III

_[signature]_ Michael Augustus Dickson
MICHAEL AUGUSTUS DICKSON

_[signature]_ James Scott Dickson
JAMES SCOTT DICKSON

## EXHIBIT "A"

Attached to and made a part of the Oil, Gas and Mineral Lease dated the 1st day of September, 2005, by and between Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson, and James Scott Dickson, as Lessor, and Sklarco L.L.C., as Lessee

### DESCRIPTION OF LANDS

Tract 2:  A certain parcel of land or piece of ground situated in Section 23, Township 17 North, Range 13 West, Parish of Bossier, State of Louisiana, and more fully described as follows, to-wit:

Commencing at the Northeast Corner of Lot 14 of Sunflower Plantation Subdivision, run South 80 degrees 44 minutes 15 seconds West a distance of 30.41 feet; thence run North 09 degrees 15 minutes 45 seconds West a distance of 16.0 feet; thence run South 09 degrees 55 minutes 00 seconds East a distance of 2279.10 feet to the point of beginning of the tract herein described. From the said point of beginning, run thence North 77 degrees 22 minutes 30 seconds East a distance of 33.86 feet, thence run South 47 degrees 12 minutes 39 seconds East a distance of 85.00 feet, thence run South 84 degrees 04 minutes 39 seconds East a distance of 235.40 feet, thence run South 45 degrees 06 minutes 21 seconds West a distance of 1752.30 feet, thence run South 52 degrees 56 minutes 21 seconds West a distance of 1395.86 feet to the East Bank of the Red River, thence run along the East Bank of the Red River the following two calls:

North 00 degrees 48 minutes 23 seconds West a distance of 1282.34 feet;  North 01 degrees 23 minutes 38 seconds West a distance of 345.54 feet, Thence run North 67 degrees 14 minutes 54 seconds East a distance of 362.62 feet, thence run North 77 degrees 22 minutes 30 seconds East a distance of 1760.28 feet to the point of beginning containing 53.358 acres of land, more or less.

Tract 3: A certain parcel or piece of ground, being 9.839 acres of land, more or less, a part of fractional section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana, and more particularly described as Tract 3 in that unrecorded plat drawn by Smith and Raley, Inc., Consulting Engineers, dated November 11, 2001, styled "Proposed Master Plan of Tracts Located in Section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana".

Tract 4A: 2.919 acres of land, more or less, in fractional Section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana, more particularly described as follows:

Commence at the northeast corner of said Section 23; thence proceed North 89 degrees 23 minutes 03 seconds West along the North line of said Section 23 for a distance of 3080.39 feet; then proceed South 00 degrees 36 minutes 57 seconds West for a distance of 601.46 feet to center line of closed and abandoned Sunflower Road and a 3/4 inch iron rod; thence proceed South 09 degrees 17 minutes 47 seconds East for a distance of 2279.19 feet to a 3/4 inch iron rod; thence proceed South 77 degrees 59 minutes 43 seconds West for a distance of 1760.28 feet to a 3/4 inch iron rod; thence proceed South 67 degrees 52 minutes 07 seconds West for a distance of 364.74 feet to the East high bank of Red River and the Point of Beginning of the tract herein described which is monumented with a 3/4 inch iron rod; thence proceed South 67 degrees 52 minutes 07 seconds West for a distance of 85.74 feet to the mean low water line of Red River; thence proceed northeasterly along said mean low water line for a distance of 1548.47 feet; thence proceed North 83 degrees 32 minutes 03 seconds East for a distance of 103.96 feet to the East high bank of Red River and a 3/4 inch iron rod; thence proceed South 14 degrees 13 minutes 31 seconds West along said high bank for a distance of 83.40 to a 3/4 inch iron rod; thence proceed South 14 degrees 41 minutes 44 seconds West along said high bank for a distance of 252.73 feet; thence proceed South 02 degrees 07 minutes 48 seconds East along said high bank for a distance of 206.45 feet; thence proceed South 12 degrees 27 minutes 58 seconds West along said high bank for a distance of 168.01 feet; thence proceed South 01 degrees 57 minutes 23 seconds East along said high bank for a distance of 376.53 feet; thence proceed South 07 degrees 12 minutes 33 seconds West along said high bank for a distance of 192.88 feet' thence proceed South 12 degrees 32 minutes 58 seconds West along said high bank for a distance of 206.91 feet' thence proceed South 00 degrees 46 minutes 25 seconds East along said high bank for a distance of 40.00 feet to the Point of Beginning of the tract herein described, containing 2.919 acres, more or less.

Tract 4B: 81.158 acres of land, more or less, a part of fractional Section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana, more particularly described as follows:  Commence at the northeast corner of said Section 23, thence proceed North 89 degrees 23 minutes 03 seconds West along the north line of said Section 23 for a distance of 3,080.39 feet; thence proceed South 00 degrees 36 minutes 57 minutes 57 seconds West for a distance of 601.46 feet the centerline of closed and abandoned Sunflower Road and the point of beginning of the tract herein described which is monumented with a ¾ inch iron rod; thence proceed South 09 degrees 17 minutes 47 seconds East for a distance of 2,279.19 feet to a ¾ inch iron rod; thence proceed South 77 degrees 59 minutes 43 seconds West for a distance of 1760.28 feet to a ¾ inch iron rod; thence proceed South 67 degrees 52 minutes 07 seconds West for a distance of 364.74 feet to the east high bank of Red River and a ¾ inch iron rod; thence proceed North 00 degrees 46 minutes 25 seconds West along said high bank for a distance of 40.00 feet; thence proceed North 12 degrees 32 minutes 58 seconds East along said high bank for a distance of 206.91 feet; thence proceed North 07 degrees 12 minutes 33 seconds East along said bank for a distance of 192.88 feet; thence proceed North 01 degrees 67 minutes 23 seconds West along said high bank for a distance of 376.53 feet; thence proceed North 12 degrees 27 minutes 58 seconds east along said high bank for a distance of 168.01 feet; thence proceed North 02 degrees 07 minutes 48 seconds West along said high bank for a distance of 206.45 feet; thence proceed North 14 degrees 41 minutes 44 seconds east along said high bank for a distance of 252.73 feet; thence proceed North 14 degrees 13 minutes 31 seconds east along said high bank for a distance of 83.40 feet to a ¾ inch iron rod; thence proceed North 83 degrees 32 minutes 03 seconds East for a distance of 264.19 feet to ¾ inch iron rod; thence proceed North 32 degrees 17 minutes 53 seconds East for a distance of 1,308.59 feet to a ¾ inch iron rod; thence proceed North 81 degrees 20 minutes 55 seconds East for a distance of 470.59 feet to a iron rod; thence proceed North 08 degrees 39 minutes 05 seconds West for a distance of 26.00 feet to the centerline of said Sunflower Road and a ¾ inch iron rod; thence proceed North 81 degrees 20 minutes 55 seconds East for a distance of 100.60 feet to the point of beginning, containing 81.158 acres, more or less.

Tract 5A:  BEING DESCRIBED AS A 32.546 ACRE, MORE OR LESS, TRACT OF LAND IN FRACTIONAL SECTION 23, TOWNSHIP 17 NORTH, RANGE 13 WEST, BOSSIER PARISH LOUISIANA AND MORE PARTICULARLY DESCRIBED AS FOLLOWS;

Commence at the north east corner of said section 23; then proceed north 89 degrees 23 minutes 03 seconds west along north line of section 23 for a distance of 3080.39 feet; then proceed south 00 degrees 36 minute 57 seconds west for a distance of 601.46 feet to the center line of closed and abandoned Sunflower Road and Point of Beginning of the tract here in described which is monumented with a 3/4 inch iron rod; then proceed north 81 degrees 20 minutes 55 seconds east along said center line for a distance of 658.15 feet to a 3/4 inch iron rod; then proceed south 08 degrees 52 minutes 39 seconds east for a distance of 2129.22 feet to a lake traverse and a 3/4 inch rod.; then proceed south 72 degrees 05 minutes 34 seconds west along said lake traverse for a distance of 341.80 feet to a 3/4 inch iron rod; then proceed south 81 degrees 10 minutes 34 seconds west along said lake traverse for a distance of 190.50 feet to a 3/4 inch iron rod; then proceed south 32 degrees 46 minutes 34 seconds west along lake traverse for a distance of 123.30 feet to a 3/4 inch iron rod; then proceed south 77 degrees 59 minutes 43 seconds west along said lake traverse for a distance of 31.52 feet to a 3/4 inch iron rod; then proceed north 09 degrees 17 minutes 47 seconds west for a distance of 2279.19 feet to the Point of Beginning of the tract here in described, containing 32.546 acres, more or less.

Tract 5B:  BEING DESCRIBED AS A 33.618 ACRE MORE OR LESS TRACT OF LAND IN FRACTIONAL SECTION 23, TOWNSHIP 17 NORTH, RANGE 13 WEST, BOSSIER PARISH LOUISIANA AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Commence at the north east corner of said section 23; then proceed north 89 degrees 23 minutes 03 seconds west along north line of section 23 for a distance of 3080.39 feet; then proceed south 00 degrees 36 minute 57 seconds west for a distance of 601.46 feet to the center line of closed and abandoned Sunflower Road and Point of Beginning of the tract here in described which is monumented with a 3/4 inch iron rod; then proceed north 81 degrees 20 minutes 55 seconds east along said center line for a distance of 658.15 feet to a 3/4 inch iron rod; then proceed south 08 degrees 52 minutes 39 seconds east for a distance of 2129.22 feet to a lake traverse and a 3/4 inch rod.; then proceed south 72 degrees 05 minutes 34 seconds west along said lake traverse for a

777

distance of 341.80 feet to a 3/4 inch iron rod to Point of Beginning, then proceed south 78 degrees 57 minutes 21 seconds east along said lake traverse for a distance of 390.60 feet to a 3/4 inch iron rod; then proceed south 61 degrees 27 minutes 21 seconds east along lake traverse for a distance of 227.60 feet to a 3/4 inch iron rod; then proceed north 89 degrees 41 minutes 39 seconds east along said lake traverse for a distance of 96.97 feet to a 3/4 inch iron rod; then proceed north 09 degrees 55 minutes 00 seconds east for a distance of 2041.81 feet to a 3/4 inch iron rod; then proceed north 80 degrees 40 minutes 15 seconds for a distance of 30.41 feet to a 3/4 inch iron rod; then proceed north 09 degrees 15 minutes 45 seconds west for a distance of 16.00 feet to 3/4 inch iron rod; then proceed in same direction for 662.72 feet to the Half way point of the call North 80 degrees 44 minutes 15 seconds used to describe all of tract five on the Smith and Raley survey. Thence proceed South 09 degrees 55 minutes 00 seconds for a distance of 2191.00 feet to the Point of Beginning of the tract here in described, containing 33.618 acres, more or less.

**Tract 7:** A tract of land known as Sunflower Point containing 585 acres, more or less, and located in Township 17 North, Range 13 West, Caddo and Bossier Parishes, Louisiana, together with and including all the batture, alluvion, and accretion appertaining thereto and all other lands between the said property and the mean low water line of the Red River, and all riparian rights in and to said property; and all right, title and interest in, on and under all roads, levees and rights-of-way on said property more particularly described as follows:

Begin at a point on the high bank of Old Red River, which is 26.3 feet South 86 degrees 34 minutes West of the Southwest corner of Lot 134, Dixie Gardens Subdivision, recorded in Conveyance Book 150, Page 410 of the Records of Caddo Parish, Louisiana; run thence North 86 degrees 34 minutes East, a distance of 455 feet; run thence North 64 degrees 37 minutes, East, a distance of 515 feet' run thence North 71 degrees 40 minutes East, a distance of 495 feet; run thence North 77 degrees 13 minutes East, a distance of 465 feet; run thence South 67 degrees 14 minutes East, a distance of 400 feet; run thence South 70 degrees 20 minutes East, a distance of 600 feet; run thence South 87 degrees 38 minutes East, a distance of 585 feet; run thence North 87 degrees 25 minutes East, a distance of 535 feet; run thence North 70 degrees 58 minutes East a distance of 560 feet, to intersect the traverse of existing high bank of Red River; run thence South 21 degrees 15 minutes West, a distance of 190 feet; run thence South 14 degrees 59 minutes West, a distance of 508.6 feet; run thence South 81 degrees 02 minutes East, a distance of 415 feet; run thence South 4 degrees 42 minutes West, a distance of 1200 feet; run thence South 13 degrees 22 minutes East, a distance of 566 feet; run thence South 27 degrees 03 minutes East, a distance of 800 feet; run thence 55 degrees 56 minutes East, a distance of 580 feet; to intersect the traverse of high bank of Old Red River; run thence South 65 degrees 03 minutes West, a distance of 289 feet; run thence South 51 degrees 08 minutes West, a distance of 807 feet; run thence South 48 degrees 57 minutes West, a distance of 540 feet; run thence South 41 degrees 16 minutes West, a distance of 376.7 feet; run thence South 57 degrees 15 minutes West, a distance of 514 feet; run thence South 67 degrees 23 minutes West, a distance of 320 feet; run thence South 79 degrees 40 minutes West, a distance of 882 feet; run thence North 80 degrees 16 minutes West, a distance of 980 feet; run thence North 77 degrees 30 minutes West , a distance of 142 feet; run thence North 50 degrees 04 minutes West, a distance of 500 feet; run thence North 36 degrees 42 minutes West, a distance of 500 feet; run thence North 33 degrees 50 minutes West, a distance of 500 feet; run thence North 32 degrees 51 minutes West, a distance of 570 feet; run thence North 22 degrees 10 minutes West, a distance of 300 feet; run thence North 18 degrees 04 minutes West, a distance of 400 feet; run thence North 22 degrees 22 minutes West, a distance of 200 feet; run thence North 16 degrees 35 minutes West, a distance of 385.6 feet; run thence North 10 degrees 46 minutes East, a distance of 557.6 feet; run thence North 16 degrees 29 minutes East, a distance of 549.5 feet; run thence North 6 degrees 31 minutes East, a distance of 1033.1 feet to the point of beginning, except that portion of Lot 137 and the adjacent abandoned portion of Dixie Drive, lying between the Easterly right of way line of the Industrial Loop Parkway and the mean low water line of the lake, said Lot 137 being in Dixie Gardens Subdivision of Caddo Parish, Louisiana.

## EXHIBIT B

Attached to and made a part of that Oil, Gas and Mineral Lease dated the 1st day of September, 2005, by and between Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson and James Scott Dickson, as Lessor, and Sklarco L.L.C., as Lessee

### ADDITIONAL PROVISIONS

NOTWITHSTANDING ANYTHING TO THE CONTRARY, THE FOLLOWING PROVISIONS WILL PREVAIL:

1.    LESSOR and LESSEE recognize that the lands covered by this lease consist of numerous tracts of land which are owned by different owners who are LESSOR hereunder in different proportions. LESSOR agrees that LESSEE is authorized to pay any and all bonuses and other payments, excluding royalties and shut-in royalties, which may be payable under this Lease in the percentages set out below and to the respective depositories herein specified:

| Credit To | Percentages | Depository |
|---|---|---|
| Sunflower Plantation, L.L.C.<br>333 Texas Street, Suite 1050<br>Shreveport, Louisiana 71101 | 12.12555014% | Pay directly to Lessor |
| C. Bickham Dickson, Jr.<br>4625 Fairfield Avenue<br>Shreveport, Louisiana 71106 | 43.93722494% | Pay directly to Lessor |
| C. Bickham Dickson, III<br>333 Texas Street, Suite 1050<br>Shreveport, Louisiana 71101 | 14.64574164% | Pay directly to Lessor |
| Michael Augustus Dickson<br>728 Oneonta<br>Shreveport, Louisiana 71106 | 14.64574164% | Pay directly to Lessor |
| James Scott Dickson<br>555 Sunflower Road<br>Bossier City, Louisiana 71112 | 14.64574164% | Pay directly to Lessor |

If LESSEE establishes production of natural gas, crude oil, condensate or other minerals from a well located on the lands covered by this lease or on lands pooled therewith, then LESSOR authorizes LESSEE to pay all proceeds from the sale of such minerals which may be payable as royalties under this Lease to each owner that is LESSOR hereunder in proportion to his or its respective interest in each tract located within the unit for the well, and further in the proportion the number of surface acres in each of the tracts covered by this Lease within the unit bears to the total number of surface acres in the unit. Shut-in royalties shall be paid to the owners who are LESSOR hereunder in the same manner and proportions as royalties. For purposes of paying royalties and shut-in royalties under this Lease, each owner that is LESSOR hereunder represents that it owns the respective interest in each tract identified in Exhibit "A" in the following percentages:

**Tract 2, 3 & 5B**

| Owner | Percentage |
|---|---|
| Sunflower | 100.00000000% |
| C. Bickham Dickson, Jr. | 0.00000000% |
| C. Bickham Dickson III | 0.00000000% |
| Michael Augustus Dickson | 0.00000000% |
| James Scott Dickson | 0.00000000% |

8.      The parties agree that post production costs may be deducted from Lessor's share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under this Lease insofar and only insofar as such costs either enhance the value of the product being sold and the price obtained for such product or are required to make the product marketable. Without limitation upon the foregoing, the treating, processing or dehydrating of natural gas to meet pipeline quality specifications shall be deemed to enhance the value of the product being sold.

9.      Lessee shall not assign, convey, sublease or otherwise transfer a controlling interest in this Lease and operations of any wells located on lands covered by this Lease, or lands pooled therewith, without the express written consent of Lessor, which shall not be unreasonably withheld.

Page 12 of 15

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this _1ST_ day of _SEPTEMBER_, 2005, before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared C. Bickham Dickson, Jr;; Caroline Haywood Dickson through her Agent C. Bickham Dickson, Jr.; C. Bickham Dickson, III; Michael Augustus Dickson; and James Scott Dickson; to me personally known, who, being by me duly sworn, did say:

That they are all of the members of SUNFLOWER PLANTATION, L.L.C., a Louisiana limited liability company, that the foregoing instrument was signed by them on behalf of said SUNFLOWER PLANTATION, L.L.C., and that said appearers acknowledged said instrument to be the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo, State of
Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:
      David A. Barlow
   Notary Public Number: 54886
    Bar Roll Number: 24290
     State of Louisiana
  My Commission is for Life

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this _1ST_ day of _SEPTEMBER_, 2005, before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, personally appeared C. BICKHAM DICKSON, JR., to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Notary Public in and for the Parish of Caddo, State of
Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:
     David A. Barlow
   Notary Public Number: 54886
    Bar Roll Number: 24290
     State of Louisiana
  My Commission is for Life

Page 13 of 15

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this _1st_ day of _SEPTEMBER_ , 2005, before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, personally appeared C. BICKHAM DICKSON, III, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Notary Public in and for the Parish of Caddo, State of
Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

> David A. Barlow
> Notary Public Number: 54886
> Bar Roll Number: 24290
> State of Louisiana
> My Commission is for Life

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this _1st_ day of _SEPTEMBER_, 2005, before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, personally appeared MICHAEL AUGUSTUS DICKSON, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Notary Public in and for the Parish of Caddo, State of
Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

> David A. Barlow
> Notary Public Number: 54886
> Bar Roll Number: 24290
> State of Louisiana
> My Commission is for Life

'783

Page 14 of 15

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this _1ST_ day of _SEPTEMBER_, 2005, before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, personally appeared JAMES SCOTT DICKSON, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Notary Public in and for the Parish of Caddo, State of Louisiana

Notary's Printed Name:

Notary Public's Number:

My Commission Expires:

David A. Barlow
Notary Public Number: 54886
Bar Roll Number: 24290
State of Louisiana
My Commission is for Life

**784**

Page 15 of 15

Gary Loftin
Caddo Parish Clerk of Court
# 2011893

C 3817   OIL, GAS AND MINERAL LEASE 05 AM

WENDY CLARK
DEPUTY CLERK

THIS AGREEMENT made this 1st day of September, 2005, between

C. BICKHAM DICKSON, III, husband of Beverly Dorris Dickson, dealing herein with his separate property under his separate administration and control, who is a major resident of and domiciled in Caddo Parish, Louisiana, with mailing address at 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101;

the above named party hereinafter referred to as Lessor;

and SKLARCO L.L.C., Lessee, whose address is 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101;

## WITNESSETH:

1. Lessor in consideration of One Hundred Dollars and Other Valuable Consideration ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulphur and all other minerals (including, without limitation, natural gas produced from coal or lignite seams), together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress to and from said lands at all times for such purposes, including operations hereunder or in connection with similar operations on adjoining land; the land to which this lease applies and which is affected hereby being situated in Bossier and Caddo Parishes, Louisiana, and described as follows, to-wit:

**See the attached Exhibit "A" for the description of lands covered by this lease.**

**See the attached Exhibit "B" for the additional provisions of this lease.**

This lease shall also extend and apply to any interest therein which Lessor may hereafter acquire by means other than a purchase, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes battures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purposes of determining the amount of bonus and the shut-in royalty payment hereunder, said land shall be deemed to contain 447.2914 acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2. Subject to the other provisions herein contained, this lease shall be for a period of three (3) years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-fifth (1/5) of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline

* } 792

or other products therefrom, the market value at the well of one-fifth (1/5) of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-fifth (1/5) of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c) on all other minerals mined and marketed, one-fifth (1/5), either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to ten dollars (10.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation. If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year, not to exceed two (2) consecutive years, by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend Lessee's rights for one year. The annual payments herein provided for may be paid directly to Lessor's credit at the address set forth above and remain the basis for such annual payment regardless of any change or changes in the ownership of the land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six

hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of operations for the drilling of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9. Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, in a manner that is consistent with the surface use restrictions set forth in Exhibit "B" to this Lease. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent. Subject to the surface use restrictions set forth in Exhibit "B" to this Lease, in exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipelines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within three hundred thirty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10. Subject to the Additional Provisions set forth in Exhibit "B" to this Lease, the rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11. In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12. In the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14. Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15. Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16. Subject to the Additional Provisions in Exhibit "B" to this Lease, Lessor hereby warrants title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In

case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:                          LESSOR:

_____            _____
                                   C. BICKHAM DICKSON, III
_____

Page 5 of 9

796

## EXHIBIT "A"

Attached to and made a part of the Oil, Gas and Mineral Lease dated the 1st day of September, 2005, by and between C. Bickham Dickson, III, as Lessor, and Sklarco L.L.C., as Lessee

## DESCRIPTION OF LANDS

Tract 1: A certain parcel or piece of ground situated in Section 23, Township 17 North, Range 13 West, Parish of Bossier, State of Louisiana, and more fully described as follows, to-wit:

Commencing at the Northeast Corner of Lot 14 of Sunflower Plantation Subdivision, go South 9 degrees 55 minutes 0 seconds East, a distance of 2,041.81 to the point of beginning. From the said point of beginning, go South 80 degrees 55 minutes 40 seconds East, a distance of 241.0 feet; thence North 86 degrees 30 minutes 02 seconds East, a distance of 105.27 feet; thence go South 73 degrees 32 minutes, 21 seconds East, a distance of 162.53 feet; thence go south 74 degrees 08 minutes, 46 seconds East, a distance of 188.84 feet; thence go North 72 degrees 03 minutes, 25 seconds East a distance of 33.81 feet; thence go South 33 degrees 15 minutes 18 seconds East, a distance of 41.87 feet; thence go South 63 degrees 56 minutes 48 seconds East, a distance of 111.10 feet; thence go South 66 degrees 16 minutes 46 seconds East, a distance of 191.12 feet; thence go South 05 degrees 31 minutes 59 seconds West, a distance of 91.73 feet; thence go South 46 degrees 40 minutes 43 seconds East, a distance of 151.49 feet; thence go South 64 degrees 31 minutes 04 seconds East, a distance of 59.06 feet; thence go South 29 degrees 49 minutes 57 seconds East, a distance of 47.64 feet; thence go South 60 degrees 35 minutes 15 seconds East, a distance of 72.09 feet; thence go South 39 degrees 19 minutes 58 seconds East, a distance of 23.15 feet; thence go South 48 degrees 46 minutes 31 East, a distance of 143.99 feet; thence go South 61 degrees 50 minutes 06 seconds East, a distance of 288.55 feet; thence go South 29 degrees 25 minutes 0 seconds east, a distance of 183.20 feet; thence go South 28 degrees 47 minutes 00 seconds East, a distance of 220.20 feet; thence go South 30 degrees 25 minutes 00 seconds East, a distance of 126.40 feet; thence go South 42 degrees 10 minutes 00 seconds East, a distance of 387.30 feet; thence go South 18 degrees 32 minutes 00 seconds East, a distance of 201.40 feet; thence go South 00 degrees 28 minutes 00 seconds West, a distance of 489.0 feet; thence go South 16 degrees 51 minutes 00 seconds East, a distance of 217.30 feet; thence go South 02 degrees 20 minutes 00 seconds East, a distance of 392.50 feet; thence go South 02 degrees 55 minutes 00 seconds West, a distance of 309.40 feet; thence go South 03 degrees 49 minutes 00 seconds West, a distance of 314.70 feet; thence go South 88 degrees 35 minutes 21 seconds West, a distance of 1,833.78; thence go South 10 degrees 38 minutes 33 seconds West, a distance of 1,695.76 feet; thence go North 75 degrees 30 minutes 39 seconds West, a distance of 1,577.27 feet; thence go North 84 degrees 48 minutes 14 seconds West, a distance of 1,008.40 feet; thence go North 69 degrees 11 minutes 07 seconds West, a distance of 434.60 feet; thence go North 27 degrees 18 minutes 54 seconds West, a distance of 1,884.19 feet; thence go North 52 degrees 56 minutes 21 seconds East, a distance of 477.04 feet; thence go North 52 degrees 56 minutes 21 seconds east, a distance of 1,395.86 feet; thence go North 45 degrees 06 minutes 21 seconds East, a distance of 1,752.30 feet; thence go North 84 degrees 04 minutes 39 seconds West, a distance of 235.40 feet; thence go North 47 degrees 12 minutes 39 seconds West, a distance of 85 feet; thence go North 32 degrees 09 minutes 21 seconds east, a distance of 123.30 feet; thence go North 80 degrees 33 minutes 21 seconds East, a distance of 190.50 feet; thence go North 71 degrees 28 minutes 21 seconds East, a distance of 341.80 feet, thence go North 78 degrees 57 minutes 21 seconds East, a distance of 390.60 feet; thence go North 61 degrees 27 minutes 21 seconds East, a distance of 227.60 feet; thence go South 89 degrees 41 minutes 39 seconds east, a distance of 96.97 feet to the point of beginning, containing 436.575 acres of land, more or less.

Tract 6: A tract of land located in Section 23, Township 17 north, Range 13 West Bossier Parish, Louisiana and containing a portion of lots 9 and 11, Sunflower Plantation as recorded in book 60, page 221. Said tract being more fully described as follow: from the northeast corner of lot 14, Sunflower Plantation run thence south 09 degrees 55 minutes 00 seconds east along the common line of lots 14 and 9 a distance of 1719.63 feet to a found ½" diameter iron pipe being on the centerline of the Red River levee and being the Point of Beginning of the tract herein described:

From Said Point of beginning run thence south 77 degrees 21 minutes 33 seconds east along the centerline of the Red River levee a distance of 858.47 feet to a found ½" diameter iron pipe, Thence

run south 65 degrees 25 minutes 11 seconds east along the centerline of the Red River levee a distance of 627.97 feet to a found ½" diameter iron pipe, Thence run south 02 degrees 11 minutes 58 seconds east with a fence a distance of 558.37 feet to a set ½" diameter iron pipe being on the high bank of the old Red River, Thence run the following 15 calls along the high bank of the old Red River, North 48 degrees 46 minutes 31 seconds west with a distance of 143.99 feet to a set ½" diameter iron pipe, North 39 degrees 19 minutes 58 seconds west a distance of 23.15 feet to a set ½" diameter iron pipe, North 60 degrees 35 minutes 15 seconds west a distance of 72.09 feet to set ½" diameter iron pipe, North 29 Degrees 49 minutes 57 seconds west a distance of 47.64 feet to a set ½" diameter iron pipe, North 64 Degrees 31 minutes 04 seconds west a distance of 59.06 feet to a set ½" diameter iron pipe, North 46 Degrees 40 minutes 43 seconds west a distance of 151.49 feet to a set ½" diameter iron pipe, North 05 degrees 31 minutes 59 seconds east to a distance of 91.73 feet to a set ½" diameter iron pipe, North 66 degrees 16 minutes 46 seconds west a distance of 191.12 feet to a set ½" diameter iron pipe, North 63 degrees 56 minutes 48 seconds west a distance of 111.10 feet to a set ½" diameter iron pipe, North 33 degrees 15 minutes 18 seconds west a distance of 41.87 feet to a set ½" diameter iron pipe, South 72 degrees 03 minutes 25 seconds west a distance of 33.81 feet to a set ½" diameter iron pipe, North 74 degrees 08 minutes 46 seconds west a distance of 188.84 feet to a set ½" diameter iron pipe, North 73 degrees 32 minutes 21 seconds west a distance of 162.53 feet to a set ½" diameter iron pipe, South 86 degrees 30 minutes 2 seconds west a distance of 105.27 feet to a set ½" diameter iron pipe, North 80 degrees 55 minutes 40 seconds west a distance of 241.04 feet to a set ½" diameter iron pipe, Thence run north 09 degrees 55 minutes 00 seconds west a distance of 322.19 feet to the Point of Beginning, Said tract containing 10.7164 acres, more or less.

## EXHIBIT B

Attached to and made a part of that Oil, Gas and Mineral Lease dated the 1st day of September, 2005, by and between C. Bickham Dickson, III, as Lessor, and Sklarco L.L.C., as Lessee

### ADDITIONAL PROVISIONS

NOTWITHSTANDING ANYTHING TO THE CONTRARY, THE FOLLOWING PROVISIONS WILL PREVAIL:

1.     This Lease is limited in depth from the surface of the ground to the subsurface depth of 15,000'.

2.     Drilling operations on or production from a well located on the lands covered by this lease or on lands pooled therewith shall maintain this lease in force only as to land included in the unit for the well. This lease may be maintained in force as to the remainder of the lands covered by this lease in any manner herein provided for.

3.     Except for lands covered by that certain Oil, Gas And Mineral Lease executed concurrently herewith by and between Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson, and James Scott Dickson, as Lessor, and Sklarco L.L.C., as Lessee, this lease shall extend and apply to, and it is the intention of Lessor to lease unto Lessee, all of Lessor's current interest to the oil, gas and other minerals in and under and that may be produced from lands located within Sections 23 Township 17 North, Range 13 West, Caddo and Bossier Parishes, Louisiana, regardless of whether such lands are correctly described in Exhibit "A." Without limitation upon the foregoing, this lease shall cover any accretion or alluvion owned by Lessor formed on the bank of the Red River adjacent to the said Tract 1.

4.     Lessor's warranty of title set forth in paragraph 16 of this lease is limited to the lands described in Exhibit "A" and does not cover any accretion or alluvion not described therein but nevertheless covered by this Lease. Subject to the surface restrictions set forth in paragraph 5 below, Lessor grants unto Lessee all rights to use the surface of the lands covered by this Lease to which Lessor is entitled to the fullest extent possible, but makes no warranty concerning use of the surface. Lessee acknowledges that its use of the surface of the lands covered by this Lease is limited by the terms and conditions of certain instruments of record creating a mineral servitude in favor of Lessor, or his predecessors in title, and Lessee agrees to conform its use of the surface to such terms and conditions, including, without limitation, the terms and conditions as to Tract 1 set forth in that certain General Warranty Deed dated March 25, 2002, executed by C. Bickham Dickson, III, as Grantor, in favor of The Conservation Fund, as Grantee, recorded under Registry No. 745580 of the Records of Bossier Parish, Louisiana. The liability of Lessor for breach of the warranty of title is limited to recovery of money paid or other property or its value given to Lessor for execution or maintenance of this Lease and any royalties delivered on production from the Lease.

5.     No drilling operations shall be conducted on Tract 6 without the express written consent of Lessor.

6.     Lessor shall be entitled to receive and/or review all drilling, mud log reports, production reports, tests and all other information pertaining to Lessee's operations on the lands covered by this Lease. Lessor will keep confidential any and all information received that is not available to the public as long as this Lease is in full force and effect.

7.     The parties agree that post production costs may be deducted from Lessor's share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under this Lease insofar and only insofar as such costs either enhance the value of the product being sold and the price obtained for such product or are required to make the product marketable. Without limitation upon the foregoing, the treating, processing or dehydrating of natural gas to meet pipeline quality specifications shall be deemed to enhance the value of the product being sold.

8.     Lessee shall not assign, convey, sublease or otherwise transfer a controlling interest in this Lease and operations of any wells located on lands covered by this Lease, or lands pooled therewith, without the express written consent of Lessor, which shall not be unreasonably withheld.

Page 8 of 9

ᴀ⁻¹   799

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this _1ST_ day of _SEPTEMBER_, 2005, before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, personally appeared C. BICKHAM DICKSON, III, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

_David A. Barlow_

Notary Public in and for the Parish of Caddo, State of Louisiana

Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

David A. Barlow
Notary Public Number: 54886
Bar Roll Number: 24290
State of Louisiana
My Commission is for Life

Page 9 of 9

**938200**

`C 4095`

KM BURROUGHS
DEPUTY CLERK

CERTIFIED

AMENDMENT AND EXTENSION OF OIL, GAS AND MINERAL LEASES

FILED AND RECORDED
BOSSIER PARISH, LA

2008 AUG -8 A 9: 30

Cynthia G. Martin
CLERK & EX-OFFICIO
RECORDER

Gary Loftin
Caddo Parish Clerk of Court

STATE OF LOUISIANA

PARISHES OF CADDO AND BOSSIER

KNOWN ALL MEN BY THESE PRESENTS THAT:

**2176805**

08/08/2008 03:11 PM
L.L.C.

WHEREAS, on the 1st day of September, 2005, SUNFLOWER PLANTATION, L.L.C., C. BICKHAM DICKSON, JR., C. BICKHAM DICKSON, III, MICHAEL AUGUSTUS DICKSON, AND JAMES SCOTT DICKSON, as Lessor, granted and delivered to SKLARCO L.L.C. ("SKLARCO" or "Lessee"), as Lessee, an Oil, Gas and Mineral Lease (herein sometime referred to as "Lease No. 1") recorded under Registry No. 2011891 of the Conveyance Records of Caddo Parish, Louisiana, and under Registry No. 852706 of the Conveyance Records of Bossier Parish, Louisiana, covering the lands therein described situated in Caddo and Bossier Parishes, Louisiana, as more particularly described in said lease, reference to Lease No. 1 is hereby made as a part hereof as if the same were fully copied herein; and

WHEREAS, on the 1st day of September, 2005, C. BICKHAM DICKSON, III, as Lessor, granted and delivered to SKLARCO L.L.C., as Lessee, an Oil, Gas and Mineral Lease ( "Lease No. 2") recorded under Registry No. 2011893 of the Conveyance Records of Caddo Parish, Louisiana, and under Registry No. 852708 of the Conveyance Records of Bossier Parish, Louisiana, covering the lands therein described situated in Caddo and Bossier Parishes, Louisiana, as more particularly described in the Lease, reference to Lease No. 2 is hereby made as a part hereof as if the same were fully copied herein (reference is sometimes made herein to Lease No. 1 and Lease No. 2 collectively as the "Leases"); and

WHEREAS, by Assignment dated November 22, 2006, recorded on December 4, 2006, under Registry No. 2069870 of the Conveyance Records of Caddo Parish, and on December 5, 2006 under Registry No. 883882 of the Conveyance Records of Bossier Parish, Louisiana, Sunflower Plantation, L.L.C., assigned its entire interest in the minerals underlying the property covered by Lease No. 1 to C. Bickham Dickson, Jr., Caroline Haywood Dickson, C. Bickham Dickson, III, Michael Augustus Dickson, and James Scott Dickson;

WHEREAS, by Act of Donation dated November 22, 2006, recorded on December 4, 2006, under Registry No. 2069871 of the Conveyance Records of Caddo Parish, and on December 5, 2006 under Registry No. 883883 of the Conveyance Records of Bossier Parish, Louisiana, C. Bickham Dickson, Jr., Caroline Haywood Dickson donated their entire interest in the minerals underlying the property covered by Lease No. 1 to C. Bickham Dickson, III, Michael Augustus Dickson, and James Scott Dickson;

WHEREAS, by "Partial Sublease of Oil, Gas and Mineral Leases" (the "Sublease") dated effective February 1, 2008, a "Memorandum" of which is recorded under Registry No. 2142878 of the Conveyance Records of Caddo Parish, Louisiana, and under Registry No. 922481 of the Conveyance Records of Bossier Parish, Louisiana, SKLARCO subleased to PETROHAWK PROPERTIES, LP ("PETROHAWK" or "Sublessee") various oil, gas and mineral leases, including the Leases INSOFAR AND ONLY INSOFAR as said leases cover and affect those depths from and below the top of the Hosston Zone, Reservoir A, Cedar Grove Field, as defined by the Louisiana Office of Conservation Order No. 967, dated January 28, 1976 (the "HOSSTON Zone"), and reserving unto SKLARCO the rights of the lessee under the leases insofar as they cover and affect those depths from the surface of the Earth to the top of the Hosston Zone, all on the terms and conditions set forth in the Sublease; and

WHEREAS, one of the Lessors to Lease No. 1, MICHAEL AUGUSTUS DICKSON is now deceased, and by Judgment of Possession dated July 28, 2008, issued in Suit No. 516,443-C of the First Judicial District Court, Caddo Parish, Louisiana, the children of the deceased, DENISE MERRELL DICKSON, MICHAEL ROBERT DICKSON AND ADDIE SMITH

Map Attached

`123`



EXHIBIT
**2**

170564-1

Page 1 of 16

CERTIFICATION ON BACK

SCANNED @ 4581120608

DICKSON were placed in possession of and succeeded to the interests of MICHAEL AUGUSTUS DICKSON (1) in and to the leased premises covered and affected by Lease No. 1 and (2) in Sunflower Plantation, L.L.C.;

WHEREAS, SKLARCO has filed an application with the Louisiana Office of Conservation for the issuance of an order for the creation of a drilling and production unit for the Rodessa Zone, Reservoir A, in the Cedar Grover Field, Caddo and Bossier Parishes Louisiana (herein referred to as the "**Unit**"), to be designated as the ROD RA SUN with the Bickham Dickson 37 No. 1 Well as the initial unit Well (attached as Exhibit "A" is the plat attached to SKLARCO's application depicting the boundaries of the proposed sand unit);

WHEREAS, C. BICKHAM DICKSON, III, JAMES SCOTT DICKSON, DENISE MERRELL DICKSON, MICHAEL ROBERT DICKSON AND ADDIE SMITH DICKSON (herein collectively referred to as "**LESSORS**") do hereby consent to the sublease of the Leases by SKLARCO to PETROHAWK and agree with PETROHAWK and SKLARCO to extend and amend the Leases, all on the terms and conditions herein set forth;

WHEREAS, SUNFLOWER PLANTATION, L.L.C., C. BICKHAM DICKSON, JR., and CAROLINE HAYWOOD DICKSON join in this Amendment and Extension of Oil and Gas Leases to ratify and confirm the prior transfers by which BICKHAM DICKSON, III, MICHAEL AUGUSTUS DICKSON, and JAMES SCOTT DICKSON acquired the entire Lessor's interest in the minerals underlying the property covered by Lease No. 1; and to confirm that in any event SUNFLOWER PLANTATION, L.L.C., C. BICKHAM DICKSON, JR., and CAROLINE HAYWOOD DICKSON agree to and have no objection to the terms and conditions herein set forth;

NOW, **THEREFORE**, in consideration of the foregoing, the mutual agreements and covenants contained in the Leases, the royalties to be payable under the terms of the Leases and the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the LESSORS, SUNFLOWER PLANTATION, L.L.C., C. BICKHAM DICKSON, JR., CAROLINE HAYWOOD DICKSON, PETROHAWK and SKLARCO do hereby agree that each of the Leases is amended as follows:

(1)     The expiration date of the primary term of the Leases as provided in Paragraph 2 of each of the Leases is extended from August 31, 2008, to August 31, 2011.

(2)     For the purpose of calculating the payments provided for in connection Lease No. 1, (including payment of royalty and bonus; and additional bonus being paid to Lessors by Petrohawk upon execution of this agreement), the property covered by Lease No. 1 shall be deemed to comprise 874.04 acres, whether it actually comprises more or less, and the property covered by Lease No. 1 shall be that certain property more particularly described in Exhibit "B-1".

(3)     For the purpose of calculating the payments provided for in connection Lease No. 2, (including payment of royalty and bonus; and additional bonus being paid to the Lessor of Lease No. 2 by Petrohawk upon execution of this agreement), the property covered by Lease No. 2 shall be deemed to comprise 511.48 acres, whether it actually comprises more or less, and the property covered by Lease No. 2 shall be that certain property more particularly described in Exhibit "B-2".

(4)     From and after the Effective Date, as to all acreage covered by each of the Leases outside the boundaries of the Unit, the royalty to be paid under the Leases shall be Twenty percent (20%) from surface of the Earth to the top of the Hosston Zone, and Twenty-four (24%) for all depths below the top of the Hosston Zone

SCANNED @ 10:08 11/26/08

other property or its value given to Lessor for execution or maintenance of the applicable lease and this Agreement and any royalties delivered on production from the applicable lease and this Agreement, and is further limited such that Lessee and Sublessee may only seek recovery against each of the parties who are Lessor thereunder as to such party's actual receipt of any such money paid, property or value given or royalties delivered.

Except as herein amended and supplemented, the Leases shall remain unchanged and in full force and effect in accordance with their respective terms, conditions and provisions. This Agreement may be executed in several counterparts, all of which shall constitute but one and the same agreement, binding on all parties hereto, notwithstanding that all the parties have not signed the same counterpart.

The effective date of this Agreement shall be July 1, 2008 (the "**Effective Date**").

THUS DONE AND SIGNED by Lessors, Lessee and Sublessee in the presence of the undersigned competent witnesses on the date set forth below each party's signature, effective as of the Effective Date.

WITNESSES:

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M. Deaton_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M. Deaton_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M. Deaton_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M. Deaton_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M. Deaton_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M. Deaton_

SUNFLOWER PLANTATION, L.L.C.

By: _C. Bickham Dickson Jr._
   C. Bickham Dickson, Jr., Member

By: _C. Bickham Dickson Jr._
   C. Bickham Dickson, Jr., Agent
   for Caroline Haywood Dickson, Member

By: _C. Bickham Dickson III_
   C. Bickham Dickson, III, Member

By: _James Scott Dickson_
   James Scott Dickson, Member

By: _Denise Merrell Dickson_
   Denise Merrell Dickson, Member

By: _Michael Robert Dickson_
   Michael Robert Dickson, Member

125

170684-1

SCANNED @ 1:00 8112668

Printed Name: J. Marshall Jones III

Printed Name: Vickie M Deaton

By: _Addie Smith Dickson_
Addie Smith Dickson, Member

Printed Name: J. Marshall Jones III

Printed Name: Vickie M Deaton

_C. Bickham Dickson Jr._
C. Bickham Dickson, Jr., Individually

Printed Name: J. Marshall Jones III

Printed Name: Vickie M Deaton

_C. Bickham Dickson Jr._
Caroline Haywood Dickson, Individually
by her Agent, C. Bickham Dickson, Jr.

Printed Name: J. Marshall Jones III

Printed Name: Vickie M Deaton

C. Bickham Dickson, III, Individually

Printed Name: J. Marshall Jones III

Printed Name: Vickie M Deaton

James Scott Dickson, Individually

Printed Name: J. Marshall Jones III

Printed Name: Vickie M Deaton

Denise Merrell Dickson, Individually

126

170584-1

SCANNED @ :@0811.2008

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M Deaton_

_Michael Robert Dickson, Individually_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M. Deaton_

_Addie Smith Dickson, individually_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M Deaton_

SKLARCO L.L.C.

By: _____
    David A. Barlow, Vice President,
    Chief Operating Officer
    Date: _8/7/08_

Printed Name: _J. Marshall Jones III_

Printed Name: _Vickie M Deaton_

PETROHAWK PROPERTIES, LP
By:    P-H. Energy, LLC
      its General Partner

By: _____
    D.R. Deffenbaugh
    its Vice President — Land, Mid-Continent
    Region
    Date: _8/7/08_

**127**

STATE OF LOUISIANA,

PARISH OF CADDO.

      On this 11th day of _August_, 2008, before me, the undersigned authority, duly acting as such in and for the above parish, state aforesaid, appeared, C. Bickham Dickson, Jr., Caroline Haywood Dickson through her Agent C. Bickham Dickson, Jr., C. Bickham Dickson, III, James Scott Dickson, Denise Merrell Dickson, Michael Robert Dickson, and Addie Smith Dickson, to me personally known, who being by me duly sworn, did say:

      That they are all of the members of SUNFLOWER PLANTATION, L.L.C., a Louisiana limited liability company, that the foregoing instrument was signed by them on behalf of said SUNFLOWER PLANTATION, L.L.C. and that said appearers acknowledged said instrument to be the free act and deed of said limited liability company.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC.
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana


STATE OF LOUISIANA,

PARISH OF CADDO.

      On the 9th day of _August_, 2008, before me personally appeared C. BICKHAM DICKSON, JR., to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed and further that he is the Agent and attorney in fact of CAROLINE HAYWOOD DICKSON, and he signed this instrument also as the free act and deed of Caroline Haywood Dickson.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.


STATE OF LOUISIANA,

PARISH OF CADDO.

      On the 9th day of _August_, 2008, before me personally appeared C. BICKHAM DICKSON, III, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC.
CADDO PARISH, LOUISIANA.
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.


128

. Page 6 of 16

STATE OF LOUISIANA,

PARISH OF CADDO.

On the 7th day of August , 2008, before me personally appeared JAMES SCOTT DICKSON, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 89179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.


STATE OF LOUISIANA,

PARISH OF CADDO.

On the 7th day of August , 2008, before me personally appeared DENISE MERRELL DICKSON, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 89179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.


STATE OF LOUISIANA,

PARISH OF CADDO.

On the 7th day of August , 2008, before me personally appeared MICHAEL ROBERT DICKSON, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 89179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.


129

170684-1

STATE OF LOUISIANA,

PARISH OF CADDO.

On the 7th day of _August_, 2008, before me personally appeared **ADDIE SMITH DICKSON**, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.

STATE OF LOUISIANA

PARISH OF CADDO.

BEFORE ME, the undersigned authority, on this the 7th day of _August_, 2008, personally appeared, **David A. Barlow**, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was signed on behalf of the said, **SKLARCO L.L.C.**, a Louisiana limited liability company, by the authority of its Members and that he executed the same as the act of such company for the purposes and consideration therein expressed, and in the capacity therein stated.

NOTARY No. 69179
MY COMMISSION IS FOR LIFE
CADDO PARISH, LOUISIANA
TIFFANY N. HARRIS, NOTARY PUBLIC

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.

STATE OF LOUISIANA

PARISH OF CADDO.

BEFORE ME, the undersigned authority, on this the 7th day of _August_, 2008, personally appeared, **D. R. Deffenbaugh**, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was signed on behalf of P-H Energy, LLC, General Partner of **PETROHAWK PROPERTIES, LP**, a Texas Limited Partnership, by the authority of its Partners and that he executed the same as the act of such company for the purposes and consideration therein expressed, and in the capacity therein stated.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.

**130**

SCANNED @ 1 @ 0 3 1 1 2 0 0 8

## EXHIBIT "A"

### AMENDMENT AND EXTENSION OF OIL, GAS AND MINERAL LEASES

Dated effective July 1, 2008

By and Among

SUNFLOWER PLANTATION, L.L.C. et al., as Lessors

And

SKLARCO, L.L.C., as Lessee, and PETROHAWK PROPERTIES, L.P., as Sublessee



**131**

170684-1

SCANNED @ 16031120@@

**EXHIBIT B-1**

[new legal for Lease No. 1]

DESCRIPTION OF A 288.64 ACRE TRACT OF LAND

A TRACT OF LAND BEING IN A PORTION OF LOTS 14, 17 AND 19 SUNFLOWER
PLANTATION SUBDIVISION, BOOK 60, PAGE 221 OF THE RECORDS OF BOSSIER
PARISH, LOUISIANA AND AN ADJACENT TRACT OF LAND, ALL BEING LOCATED
IN SECTIONS 22, 23, AND 37 TOWNSHIP 17 NORTH,RANGE 13 WEST, BOSSIER
PARISH,LOUISIANA.  SAID TRACT BEING MORE FULLY DESCRIBED AS FOLLOWS:
BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 14, RUN THENCE SOUTH
09°17'43" EAST A DISTANCE OF 2041.82 FEET,

THENCE RUN NORTH 89°04'22" WEST A DISTANCE OF 96.94 FEET,

THENCE RUN SOUTH 62°04'38" WEST A DISTANCE OF 227.60 FEET,

THENCE RUN SOUTH 79°34'38" WEST A DISTANCE OF 390.60 FEET,

THENCE RUN SOUTH 72°05'38" WEST A DISTANCE OF 341.80 FEET,

THENCE RUN SOUTH 81°10'38" WEST A DISTANCE OF 190.50 FEET,

THENCE RUN SOUTH 32°46'38" WEST A DISTANCE OF 123.30 FEET,

THENCE RUN SOUTH 46°35'22" EAST A DISTANCE OF 85.00 FEET,

THENCE RUN SOUTH 83°27'22" EAST A DISTANCE OF 235.40 FEET,

THENCE RUN SOUTH 45°43'38" WEST A DISTANCE OF 1752.30 FEET,

THENCE RUN SOUTH 53°33'38" WEST A DISTANCE OF 1872.90 FEET,

THENCE RUN SOUTH 78°13'35" WEST A DISTANCE OF 938.80 FEET TO THE MEAN
LOW WATER (OF JUNE 2008),

THENCE RUN WESTERLY, NORTHERLY AND EASTERLY ALONG THE MEAN LOW
WATER (OF JUNE 2008) THE FOLLOWING TWENTY THREE CALLS:

THENCE RUN NORTH 22°25'08" WEST A DISTANCE OF 59.32 FEET,

THENCE RUN NORTH 02°41'46" EAST A DISTANCE OF 234.55 FEET,

THENCE RUN NORTH 07°54'13" WEST A DISTANCE OF 200.97 FEET,

THENCE RUN NORTH 05°50'09" EAST A DISTANCE OF 398.62 FEET,

THENCE RUN NORTH 01°10'34" WEST A DISTANCE OF 285.00 FEET,

THENCE RUN NORTH 15°04'08" EAST A DISTANCE OF 305.89 FEET,

THENCE RUN NORTH 20°13'37" EAST A DISTANCE OF 293.96 FEET,

THENCE RUN NORTH 14°57'59" EAST A DISTANCE OF 291.74 FEET,

THENCE RUN NORTH 26°42'15" EAST A DISTANCE OF 358.11 FEET,

THENCE RUN NORTH 48°17'01" EAST A DISTANCE OF 180.14 FEET,

**132**

SCANNED @ 10:08:11 12063

THENCE RUN NORTH 82°48'56" EAST A DISTANCE OF 124.15 FEET,

THENCE RUN NORTH 20°57'56" WEST A DISTANCE OF 74.48 FEET,

THENCE RUN NORTH 32°19'54" WEST A DISTANCE OF 130.92 FEET,

THENCE RUN NORTH 42°06'19" EAST A DISTANCE OF 186.89 FEET,

THENCE RUN NORTH 42°53'00" EAST A DISTANCE OF 291.09 FEET,

THENCE RUN NORTH 37°44'35" EAST A DISTANCE OF 264.61 FEET,

THENCE RUN NORTH 35°33'51" EAST A DISTANCE OF 222.43 FEET,

THENCE RUN NORTH 30°07'23" EAST A DISTANCE OF 416.83 FEET,

THENCE RUN NORTH 18°53'39" EAST A DISTANCE OF 260.10 FEET,

THENCE RUN NORTH 19°36'27" EAST A DISTANCE OF 306.28 FEET,

THENCE RUN NORTH 26°49'56" EAST A DISTANCE OF 147.68 FEET,

THENCE RUN NORTH 12°54'04" EAST A DISTANCE OF 91.15 FEET,

THENCE RUN NORTH 25°16'21" EAST A DISTANCE OF 146.50 FEET TO THE SOUTH RIGHT-OF-WAY LINE OF SUNFLOWER ROAD,

THENCE RUN NORTH 81°21'32" EAST ALONG SAID SOUTH RIGHT-OF-WAY LINE A DISTANCE OF 1165.43 FEET,

THENCE RUN NORTH 08°38'28" WEST A DISTANCE OF 16.00 FEET TO THE CENTERLINE OF A CLOSED SECTION OF SUNFLOWER ROAD (CLOSED BY ORDINANCE NO. 3506 DATED 09/10/97),

THENCE RUN NORTH 81°21'32" EAST ALONG SAID CENTERLINE OF CLOSED SECTION A DISTANCE OF 1416.95 FEET,

THENCE RUN SOUTH 08°38'28" EAST A DISTANCE OF 16.00 FEET TO SAID SOUTH RIGHT-OF-WAY LINE,

THENCE RUN NORTH 81°14'45" EAST ALONG SAID SOUTH RIGHT-OF-WAY LINE A DISTANCE OF 30.41 FEET TO THE POINT OF BEGINNING,

SAID TRACT CONTAINING 288.64 ACRES

## TOGETHER WITH:

A tract of land known as Sunflower Point containing 585.4 acres, more or less, and located in Township 17 North, Range 13 West, Caddo and Bossier Parishes, Louisiana, together with and including all the batture, alluvion, and accretion appertaining thereto and all other lands between the said property and the mean low water line of the Red River, and all riparian rights in and to said property; and all right, title and interest in, on and under all roads, levees and rights-of-way on said property more particularly described as follows:

Begin at a point on the high bank of Old Red River, which is 26.3 feet South 86 degrees 34 minutes West of the Southwest corner of Lot 134, Dixie Gardens Subdivision, recorded in Conveyance Book 150, Page 410 of the Records of Caddo Parish, Louisiana; run thence North 86 degrees 34 minutes East, a distance of 455 feet; run thence North 64 degrees 37 minutes East, a distance of 515 feet; run thence North 71 degrees 40 minutes East, a distance of 495 feet; run thence North 77 degrees 13 minutes East, a distance of 465 feet; run thence South 67 degrees 14 minutes East, a distance of 400 feet; run thence South 70 degrees 20 minutes East, a distance of

SCANNED: @:@08112864

600 feet; run thence South 87 degrees 38 minutes East, a distance of 585 feet; run thence North 87 degrees 25 minutes East, a distance of 535 feet; run thence North 70 degrees 58 minutes East a distance of 560 feet, to intersect the traverse of existing high bank of Red River; run thence South 21 degrees 15 minutes West, a distance of 190 feet; run thence South 14 degrees 59 minutes West, a distance of 508.6 feet; run thence South 81 degrees 02 minutes East, a distance of 415 feet; run thence South 4 degrees 42 minutes West, a distance of 1200 feet; run thence South 13 degrees 22 minutes East, a distance of 566 feet; run thence South 27 degrees 03 minutes East, a distance of 800 feet; run thence 55 degrees 56 minutes East, a distance of 580 feet; to intersect the traverse of high bank of Old Red River; run thence South 65 degrees 03 minutes West, a distance of 289 feet; run thence South 51 degrees 08 minutes West, a distance of 807 feet; run thence South 48 degrees 57 minutes West, a distance of 540 feet; run thence South 41 degrees 16 minutes West, a distance of 376.7 feet; run thence South 57 degrees 15 minutes West, a distance of 514 feet; run thence South 67 degrees 23 minutes West, a distance of 320 feet; run thence South 79 degrees 40 minutes West, a distance of 882 feet; run thence North 80 degrees 16 minutes West, a distance of 980 feet; run thence North 77 degrees 30 minutes West , a distance of 142 feet; run thence North 50 degrees 04 minutes West, a distance of 500 feet; run thence North 36 degrees 42 minutes West, a distance of 500 feet; run thence North 33 degrees 50 minutes West, a distance of 500 feet; run thence North 32 degrees 51 minutes West, a distance of 570 feet; run thence North 22 degrees 10 minutes West, a distance of 300 feet; run thence North 18 degrees 04 minutes West, a distance of 400 feet; run thence North 22 degrees 22 minutes West, a distance of 200 feet; run thence North 16 degrees 35 minutes West, a distance of 385.6 feet; run thence North 10 degrees 46 minutes East, a distance of 557.6 feet; run thence North 16 degrees 29 minutes East, a distance of 549.5 feet; run thence North 6 degrees 31 minutes East, a distance of 1033.1 feet to the point of beginning, except that portion of Lot 137 and the adjacent abandoned portion of Dixie Drive, lying between the Easterly right of way line of the Industrial Loop Parkway and the mean low water line of the lake, said Lot 137 being in Dixie Gardens Subdivision of Caddo Parish, Louisiana.

SCANNED @ :00811200S

**EXHIBIT B-2**

[new legal for Lease No. 2]

DESCRIPTION OF A 500.76 ACRE TRACT OF LAND

A TRACT OF LAND BEING IN A PORTION OF LOTS 9, 11 AND 14 SUNFLOWER PLANTATION SUBDIVISION, BOOK 60, PAGE 221 OF THE RECORDS OF BOSSIER PARISH, LOUISIANA AND AN ADJACENT TRACT OF LAND, ALL BEING LOCATED IN SECTIONS 23, 24, 25, 26, AND 37 TOWNSHIP 17 NORTH, RANGE 13 WEST, BOSSIER PARISH, LOUISIANA. SAID TRACT BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING FROM THE NORTHEAST CORNER OF SAID LOT 14, RUN THENCE SOUTH 09°17'43" EAST A DISTANCE OF 2041.82 FEET TO THE POINT OF BEGINNING OF THE TRACT HEREIN DESCRIBED,

FROM SAID POINT OF BEGINNING, RUN THENCE SOUTH 80°18'22" EAST A DISTANCE OF 241.04 FEET,

THENCE RUN NORTH 87°07'19" EAST A DISTANCE OF 105.27 FEET,

THENCE RUN SOUTH 73°14'38" EAST A DISTANCE OF 351.36 FEET,

THENCE RUN NORTH 72°40'42" EAST A DISTANCE OF 33.81 FEET,

THENCE RUN SOUTH 32°38'01" EAST A DISTANCE OF 41.87 FEET,

THENCE RUN SOUTH 64°48'02" EAST A DISTANCE OF 302.15 FEET,

THENCE RUN SOUTH 06°09'16" WEST A DISTANCE OF 91.73 FEET,

THENCE RUN SOUTH 46°03'26" EAST A DISTANCE OF 151.49 FEET,

THENCE RUN SOUTH 63°53'46" EAST A DISTANCE OF 59.06 FEET,

THENCE RUN SOUTH 29°12'40" EAST A DISTANCE OF 47.64 FEET,

THENCE RUN SOUTH 59°57'57" EAST A DISTANCE OF 72.09 FEET,

THENCE RUN SOUTH 46°50'59" EAST A DISTANCE OF 166.87 FEET,

THENCE RUN SOUTH 61°12'48" EAST A DISTANCE OF 288.55 FEET,

THENCE RUN SOUTH 28°47'43" EAST A DISTANCE OF 183.20 FEET,

THENCE RUN SOUTH 28°09'43" EAST A DISTANCE OF 220.20 FEET,

THENCE RUN SOUTH 29°47'43" EAST A DISTANCE OF 126.40 FEET,

THENCE RUN SOUTH 41°32'43" EAST A DISTANCE OF 387.30 FEET,

THENCE RUN SOUTH 17°54'43" EAST A DISTANCE OF 201.40 FEET,

THENCE RUN SOUTH 01°05'17" WEST A DISTANCE OF 489.00 FEET,

THENCE RUN SOUTH 16°13'43" EAST A DISTANCE OF 217.30 FEET,

THENCE RUN SOUTH 01°42'43" EAST A DISTANCE OF 392.50 FEET,

THENCE RUN SOUTH 03°32'17" WEST A DISTANCE OF 309.40 FEET,

**135**

170684-1

SCANNED @ 1808:112008

THENCE RUN SOUTH 04°26'17" WEST A DISTANCE OF 314.70 FEET,

THENCE RUN SOUTH 89°12'38" WEST A DISTANCE OF 1833.78 FEET,

THENCE RUN SOUTH 11°15'50" WEST A DISTANCE OF 1832.26 FEET TO THE MEAN LOW WATER (OF JUNE 2008), ·

THENCE RUN WESTERLY, NORTHERLY AND EASTERLY ALONG THE MEAN LOW WATER (OF JUNE 2008) THE FOLLOWING TWENTY TWO CALLS:

NORTH 70°53'05" WEST A DISTANCE OF 203.24 FEET,

NORTH 75°43'12" WEST A DISTANCE OF 219.71 FEET,

NORTH 77°39'52" WEST A DISTANCE OF 223.86 FEET,

NORTH 87°25'25" WEST A DISTANCE OF 229.31 FEET,

· NORTH 87°27'00" WEST A DISTANCE OF 131.72 FEET,

NORTH 80°28'31" WEST A DISTANCE OF 140.80 FEET,

SOUTH 79°03'15" WEST A DISTANCE OF 162.79 FEET,

SOUTH 88°01'18" WEST A DISTANCE OF 182.56 FEET,

NORTH 87°07'13" WEST A DISTANCE OF 299.21 FEET,

NORTH 85°04'19" WEST A DISTANCE OF 241.14 FEET,

NORTH 86°55'12" WEST A DISTANCE OF 217.52 FEET,

NORTH 77°48'18" WEST A DISTANCE OF 588.21 FEET,

NORTH 76°50'08" WEST A DISTANCE OF 251.78 FEET,

NORTH 63°51'49" WEST A DISTANCE OF 249.37 FEET,

NORTH 64°28'31" WEST A DISTANCE OF 390.50 FEET,

NORTH 53°52'11" WEST A DISTANCE OF 310.86 FEET,

NORTH 48°43'10" WEST A DISTANCE OF 298.53 FEET,

NORTH 44°19'33" WEST A DISTANCE OF 246.00 FEET,

NORTH 30°00'10" WEST A DISTANCE OF 314.90 FEET,

NORTH 21°52'15" WEST A DISTANCE OF 335.49 FEET,

NORTH 10°29'18" WEST A DISTANCE OF 341.80 FEET,

NORTH 22°25'08" WEST A DISTANCE OF 155.30 FEET,

THENCE RUN NORTH 78°13'35" EAST A DISTANCE OF 938.80 FEET,

THENCE RUN NORTH 53°33'38" EAST A DISTANCE OF 1872.90 FEET,

THENCE RUN NORTH 45°43'38" EAST A DISTANCE OF 1752.30 FEET,

THENCE RUN NORTH 83°27'22" WEST A DISTANCE OF 235.40 FEET,

**136**

170684-1

SCANNED @ i @ 08 i i 2 GG 8

THENCE RUN NORTH 46°35'22" WEST A DISTANCE OF 85.00 FEET,

THENCE RUN NORTH 32°46'38" EAST A DISTANCE OF 123.30 FEET,

THENCE RUN NORTH 81°10'38" EAST A DISTANCE OF 190.50 FEET,

THENCE RUN NORTH 72°05'38" EAST A DISTANCE OF 341.80 FEET,

THENCE RUN NORTH 79°34'38" EAST A DISTANCE OF 390.60 FEET,

THENCE RUN NORTH 62°04'38" EAST A DISTANCE OF 227.60 FEET,

THENCE RUN SOUTH 89°04'17" EAST A DISTANCE OF 96.94 FEET,
TO THE POINT OF BEGINNING,

SAID TRACT CONTAINING 500.76 ACRES

### TOGETHER WITH:

DESCRRIPTION OF A 10.72 ACRE TRACT OF LAND

A TRACT OF LAND BEING IN A PORTION OF LOTS 9 AND 11 SUNFLOWER
PLANTATION SUBDIVISION, BOOK 60, PAGE 221 OF THE RECORDS OF BOSSIER
PARISH, LOUISIANA AND AN ADJACENT TRACT OF LAND, ALL BEING LOCATED
IN SECTION 23, TOWNSHIP 17 NORTH, RANGE 13 WEST, BOSSIER PARISH,
LOUISIANA. SAID TRACT BEING MORE FULLY DESCRIBED AS FOLLOWS:
COMMENCING FROM THE NORTHEAST CORNER OF SAID LOT 14, RUN THENCE
SOUTH 09°17'43" EAST A DISTANCE OF 1719.63 FEET TO THE CENTERLINE OF AN
EXISTING LEVEE BEING THE POINT OF BEGINNING OF THE TRACT HEREIN
DESCRIBED,

FROM SAID POINT OF BEGINNING, RUN THENCE ALONG SAID LEVEE CENTERLINE
THE FOLLOWING TWO CALLS:

SOUTH 76°44'16" EAST A DISTANCE OF 858.47 FEET,

SOUTH 64°47'54" EAST A DISTANCE OF 627.97 FEET,

THENCE RUN SOUTH 01°34'41" EAST A DISTANCE OF 558.37 FEET,

THENCE RUN NORTH 46°50'59" WEST A DISTANCE OF 166.87 FEET,

THENCE RUN NORTH 59°57'57" WEST A DISTANCE OF 72.09 FEET,

THENCE RUN NORTH 29°12'40" WEST A DISTANCE OF 47.64 FEET,

THENCE RUN NORTH 63°53'46" WEST A DISTANCE OF 59.06 FEET,

THENCE RUN NORTH 46°03'26" WEST A DISTANCE OF 151.49 FEET,

THENCE RUN NORTH 06°09'16" EAST A DISTANCE OF 91.73 FEET,

THENCE RUN NORTH 64°48'02" WEST A DISTANCE OF 302.15 FEET,

THENCE RUN NORTH 32°38'01" WEST A DISTANCE OF 41.87 FEET,

THENCE RUN SOUTH 72°40'42" WEST A DISTANCE OF 33.81 FEET,

THENCE RUN NORTH 73°14'38" WEST A DISTANCE OF 351.36 FEET,

State of Louisiana, Parish of Bossier
I hereby certify this to be a true and correct copy of an
original instrument filed in my office on the date and
hour and under the registry number assigned hereon
to be recorded in
    Conveyances - Volume _____ Page _____
    Mortgages - Volume _____ Page _____
Given under my hand and seal of office on this the
_____ day of _____ 20___
_____
Deputy Clerk and Ex-Officio Deputy Recorder
Parish of Bossier, State of Louisiana

GSL

139

# BLANCHARD WALKER

A TRADITION OF EXCELLENCE SINCE 1917

BLANCHARD, WALKER, O'QUIN & ROBERTS
A PROFESSIONAL LAW CORPORATION

400 Texas Street, Suite 1400
Shreveport, LA 71101
Firm: 318.221.6858
Fax: 318.227.2967
Web: www.bwor.com

July 8, 2010

Mailing Address:
P.O. Drawer 1126
Shreveport, LA 71163-1126

**CERTIFIED MAIL-**
**RETURN RECEIPT REQUESTED**
Petrohawk Properties, L.P.
1000 Louisiana, Suite 5600
Houston, Texas 77002

**MICHAEL E. RIDDICK**
Direct: 318.934.0264
Email: mriddick@bwor.com

Attention:    Mr. Stephen W. Herod
Executive Vice President – Corporate Development

RE:    Oil, Gas and Mineral dated September 1, 2005, between Sunflower Plantation, L.L.C., et al., and Sklarco L.L.C. recorded in Conveyance Book 3817, page 770 of the records of Caddo Parish and Conveyance Book 1356, page 359 of the records of Bossier Parish, and

Oil, Gas and Mineral dated September 1, 2005, between C. Bickham Dickson III, and Sklarco L.L.C. recorded in Conveyance Book 3817, page 792 of the records of Caddo Parish and Conveyance Book 1356, page 371 of the records of Bossier Parish.

Gentlemen:

We represent C. Bickham Dickson, III and Sunflower Plantation, L.L.C., the lessors under both of the referenced oil, gas and mineral leases (the "Leases"). Pursuant to a sublease dated February 1, 2008, Petrohawk Properties, L.P. ("Petrohawk") acquired certain rights under the Leases below the top of the Hosston Zone. Portions of the leased lands are included in HA RA SUA, HA RA SUC, and HA RA SUD in the Cedar Grove Field, on which Petrohawk has completed the Dickson 37-1-H Well, the Grayson 24-1-H Well and the Grayson 25-1-H Well (the "Wells"). Our clients have received their initial royalty checks for two of the Wells, which checks reflected deductions for gathering and treating charges, however, there was no indication to whom the charges were paid or what services were provided for those charges.

Paragraph 8 on Exhibit B to the Leases provides that only post production costs that enhance the value of the gas being sold may be deducted from the royalties. Since gathering services are typically services provided by the operator of a well as a part of the normal well operation, without further explanation, it is unlikely such costs can be justified as enhancing the value of the gas being sold. Moreover, pursuant to the decision in W. J. Wegman, Jr., et al., v. Central Transmission, Inc., 499 So. 2d 436 (La. App 2 Cir., 1986), writ denied 503 So. 2d 478 (La. 1987), costs for the gathering of gas within the field over relatively short distances, especially when paid to an affiliate of the operator, may not be deducted from the royalty payments.    In addition, no explanation has been provided regarding the nature of the treating

**EXHIBIT**
tablas**3**

Petrohawk Properties, L.P.
July 8, 2010
Page 2

services for which deductions were made. Please provide me a detailed explanation of the services received in consideration for the fees and to whom the fees were paid.

In addition, Petrohawk operates the HA RA SUB; B&K Exploration 37-1-H Well (the "B&K Well"), which is also located within a unit including a portion of the lands covered by the Leases. Since severance taxes were not deducted from the last royalty check received by our clients, it appears that Petrohawk's application for severance tax relief for production from a horizontal well may have been approved. If that is the case, please reimburse our clients for severance taxes previously withheld from their royalty checks.

Accordingly, demand is hereby made pursuant to La. R.S. 31:137 for payment of the amounts deducted from the royalties due on production from the Wells attributable to gathering and treating charges. If payment is not received within thirty (30) days of your receipt of this letter, we have be instructed to pursue all available remedies, including, without limitation, damages provided under La. R.S. 31:140. Further, please insure that no further deductions are made for gathering and treating charges with respect to the Wells. In addition, please confirm that Petrohawk's application for severance tax relief for the B&K Well has been approved and, if so, please reimburse our clients the amounts previously withheld for their share of such taxes.

Should you have any questions, please do not hesitate to call me.

Yours very truly,
BLANCHARD, WALKER, O'QUIN & ROBERTS

Michael E. Riddick

cc:     Mr. David Barlow, Sklarco L.L.C.
        Mr. C. Bickham Dickson III

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY | |
|---|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ | ☐ Agent<br>☐ Addressee |
| | B. Received by (Printed Name)<br>K Jones | C. Date of Delivery |
| 1. Article Addressed to:<br><br>**Petrohawk Properties, L.P.**<br>*Attn: Mr. Stephen W. Herod*<br>**Executive Vice President – Corp. Dev.**<br>**1000 Louisiana, Suite 5600**<br>**Houston, Texas 77002** | D. Is delivery address different from item 1? ☐ Yes<br> If YES, enter delivery address below: ☒ No | |
| | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☒ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D. | |
| | 4. Restricted Delivery? (Extra Fee)  ☐ Yes | |
| 2. Article Number<br>(Transfer from service label) | 7006 2760 0004 4618 2379 | |

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

# OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ 0.44 | |
| Certified Fee | 2.80 | Postmark<br>Here |
| Return Receipt Fee<br>(Endorsement Required) | 2.30 | |
| Restricted Delivery Fee<br>(Endorsement Required) | | |
| Total Postage & Fees | $ 5.54 | July 8, 2010 |

Sent To Petrohawk Properties, L.P.
Street, Apt. No.; Attn: Mr. Stephen W. Herod
or PO Box No. Executive Vice President Corp. Dev.
City, State, ZIP+4 1000 Louisiana, Suite 5600          MER

PS Form 3800, August 2006          See Reverse for Instructions

7006 2760 0004 4618 2379

*Citation*

**SERVE**

DICKSON, C BICKHAM III ETAL

    VERSUS

SKLARCO LLC ETAL

NO. 547558-B
STATE OF LOUISIANA
PARISH OF CADDO
FIRST JUDICIAL DISTRICT COURT

THE STATE OF LOUISIANA: TO PETROHAWK PROPERTIES LP, THRU
                       NATIONAL REGISTERED AGENTS INC
                       1011 N CAUSEWAY BLVD, STE 3
                       MANDEVILLE LA 70471

                  of the Parish of ST TAMMANY

YOU HAVE BEEN SUED.
Attached to this Citation is a certified copy of the Petition.* The
petition tells you what you are being sued for.

You must EITHER do what the petition asks, OR, within FIFTEEN (15) days
after you have received these documents, you must file an answer or other
legal pleadings in the Office of the Clerk of this Court at the Caddo
Parish Court House, 501 Texas Street, Room 103, Shreveport, Louisiana.

If you do not do what the petition asks, or if you do not file an answer
or legal pleading within FIFTEEN (15) days, a judgment may be entered
against you without further notice.

This Citation was issued by the Clerk of Court for Caddo Parish, on this
date January 27, 2011.

*Also attached are the following:
\_\_ REQUEST FOR ADMISSIONS OF FACTS
\_\_ INTERROGATORIES
\_\_ REQUEST FOR PRODUCTION OF DOCUMENTS
\_\_

GARY LOFTIN, CLERK OF COURT
MIKE SPENCE, CHIEF DEPUTY

By: _____
             Deputy Clerk

JOHN ANDREW DURRETT - 7158
              Attorney

NOTICE: ALL PARTIES ARE
EXPECTED TO COMPLY WITH
ALL LOCAL COURT RULES
INCLUDING BUT NOT LIMITED
TO RULE 12 OF FAMILY LAW
DIVISION RULES.

A TRUE COPY -- ATTEST

_____
             Deputy Clerk

----------------------------------------------------------------

    These documents mean you have been sued. Legal assistance is

advisable and you should contact a lawyer immediately. If you want a

lawyer and cannot find one, please call the Shreveport Lawyer Referral

Service at 222-0720. The Shreveport Lawyer Referral Service is affiliated

with the Shreveport Bar Association. If eligible, you may be entitled to

legal assistance at no cost to you through Legal Services of North

Louisiana, Inc, please call 222-7281 for more information.

    JUDGES AND COURT PERSONNEL, INCLUDING THE SHERIFF AND CLERK OF COURT

EMPLOYEES, CANNOT GIVE LEGAL ADVICE.

    If you are a person with a disability, reasonable accomodation and

assistance may be available to allow for your participation in the court

proceedings. Please contact the Clerk of Court's office for more information.

    **SERVICE COPY**

## *NATIONAL REGISTERED AGENTS, INC.*

### *SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM*

To:  DAVID M. RAPP
HINKLE ELKOURI LAW FIRM, LLC
2000 EPIC CENTER, 301 N. MAIN
WICHITA, KS 67202

SOP Transmittal # LA19913

(888) 617-4545 - Telephone
(609) 716-0820 - Fax

Entity Served: PETROHAWK PROPERTIES, LP (Domestic State: TEXAS)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of     LOUISIANA     on this  4  day of     February     , 2011   . The following is a summary of the document(s) received:

1.     Title of Action: C. BICKHAM DICKSON, III ET AL VS SKLARCO LLC ET AL

2.     Document(s) served: Summons/Citation/Third Party Summons, Complaint/Petition/Third Party Complaint
Other: PETITION FOR DECLARATORY JUDGMENT AND ANCILLARY RELIEF,EXHIBITS

3.     Court of Jurisdiction/     FIRST JDC PARISH OF CADDO, STATE OF LOUISIANA
Case & Docket Number: 547558-B

4.     Amount Claimed, if any:

5.     Method of Service (select one):
X Personally served by:     __ Process Server     X Deputy Sheriff     __ U. S Marshall
__ Delivered Via:     __ Certified Mail     __ Regular Mail     __ Facsimile
(Envelope enclosed)     (Envelope enclosed)
__ Other (Explain):

6.     Date and Time of Receipt: 2/4/2011 12:05:24 PM EST (GMT -5)

7.     Appearance/Answer Date: WITHIN 15 DAYS OF SERVICE

8.     Received From:     9.   Federal Express Airbill # 796728707869
(Name, Address & Telephone Number)
10. Call Made to: DAVID M. RAPP

11.     Special Comments:
This SOP was digitally scanned and First Serve notification was sent to: CONNIE D. TATUM (CTATUM@HINKLAW.COM), DAVID S. ELKOURI (DELKOURI@PETROHAWK.COM), DAVID M. RAPP (DRAPP@HINKLAW.COM), ERIC BARTH (EBARTH@HINKLAW.COM), JOHN BROOMES (JBROOMES@HINKLAW.COM), JUSTIN MARLLES (JMARLLES@PETROHAWK.COM), WALTER MAYER (WMAYER@PETROHAWK.COM)..

NATIONAL REGISTERED AGENTS, INC.     Copies To:

Transmitted by Amy Daniels

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

RECEIVED

FEB - 7 2011

ORIGINAL



# NATIONAL REGISTERED AGENTS, INC.

The Right Choice for Registered Agent Services

# Cover Page for LA19913

This file contains **20** pages of graphic image of Legal Process received in the State of **LOUISIANA** on **2/4/2011** for **PETROHAWK PROPERTIES, LP**.

The served document(s) will be forwarded by Federal Express to the individual designated to receive Service of Process from NRAI. As this document(s) has been separated to enable scanning of the image, the Official Record on file with the Court of Jurisdiction should be relied on as the complete record. NRAI accepts no responsibility or liability for missing or incorrectly collated pages in the reassembly of the served document(s).

FEB 1 6 2011

COLVIN ROBERSON
CADDO DEPUTY CLERK OF COURT

C. BICKHAM DICKSON, III,       DOCKET NO. 547,558-B
ET AL.

VERSUS               FIRST JUDICIAL DISTRICT COURT

SKLARCO L.L.C., ET AL.       CADDO PARISH, LOUISIANA

## ANSWER AND DEFENSE OF SKLARCO, L.L.C.

NOW INTO COURT, through undersigned counsel, comes defendant, SKLARCO,

L.L.C. ("Defendant"), who, in response to the allegations of the "Petition for Declaratory

Judgment and Ancillary Relief" (the "Petition") responds as follows:

## AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, were caused by the actions or inactions of Petrohawk

Properties. L.P., or other parties for whom Defendant is not responsible.

## ANSWER TO PETITION FOR
## DECLARATORY JUDGMENT AND ANCILLARY RELIEF

1.

In answer to Paragraph 1 of the Petition, Defendant admits that it has been named as a

defendant in this action and that it is domiciled at 401 Edwards Street, Suite 1601, Shreveport,

Louisiana 71101. Defendant denies the remaining allegations of Paragraph 1 of the Petition

based upon a lack of information sufficient to justify a belief therein.

2.

Defendant denies the allegations of Paragraph 2 of the Petition based upon a lack of

information sufficient to justify a belief therein.

3.

In answer to Paragraph 3 of the Petition, Defendant admits that it was granted Oil, Gas

and Mineral Leases dated September 1, 2005 and recorded on December 14, 2005 in the

Conveyance Records of Caddo Parish, Louisiana (the "Leases"). Defendant specifically pleads

that true and correct copies of the Leases are the best evidence of the contents thereof, and

Defendant denies the allegations of Paragraph 3 of the Petition to the extent they may be

inconsistent with the contents of the Leases.

4.

In answer to Paragraph 4 of the Petition, Defendant admits that it entered an Amendment and Extension of Oil, Gas and Mineral Leases dated effective July 1, 2008 and recorded on August 8, 2008 in the Conveyance Records of Caddo Parish, Louisiana (the "Lease Extension"). Defendant specifically pleads that a true and correct copy of the Lease Extension is the best evidence of the contents thereof, and Defendant denies the allegations of Paragraph 4 of the Petition to the extent they may be inconsistent with the contents of the Lease Extension.

5.

Defendant specifically pleads that a true and correct copy of the Lease Extension is the best evidence of the contents thereof, and Defendant denies the allegations of Paragraph 5 of the Petition to the extent they may be inconsistent with the contents of the Lease Extension.

6.

Defendant specifically pleads that a true and correct copy of the Lease Extension is the best evidence of the contents thereof, and Defendant denies the allegations of Paragraph 6 of the Petition to the extent they may be inconsistent with the contents of the Lease Extension.

7.

Defendant specifically pleads that a true and correct copy of the Lease Extension is the best evidence of the contents thereof, and Defendant denies the allegations of Paragraph 7 of the Petition to the extent they may be inconsistent with the contents of the Lease Extension.

8.

Defendant denies the allegations of Paragraph 8 of the Petition based upon a lack of information sufficient to justify a belief therein.

9.

Defendant admits the allegations of Paragraph 9 of the Petition.

10.

Defendant admits the allegations of Paragraph 10 of the Petition.

11.

In answer to Paragraph 11 of the Petition, Defendant admits that it has not deducted gathering services and fees from Plaintiffs' share of the proceeds attributable to Defendants sale of hydrocarbons produced from zones lying above the Hosston Zone. All other allegations

contained in Paragraph 11 of the Petition are denied for lack of information sufficient to justify a belief therein.

12.

Defendant denies the allegations of Paragraph 12 of the Petition based upon a lack of information sufficient to justify a belief therein.

13.

Defendant denies the allegations of Paragraph 13 of the Petition based upon a lack of information sufficient to justify a belief therein.

14.

Defendant denies the allegations of Paragraph 14 of the Petition based upon a lack of information sufficient to justify a belief therein.

15.

Defendant denies the allegations of Paragraph 15 of the Petition based upon a lack of information sufficient to justify a belief therein.

16.

Defendant denies the allegations of Paragraph 16 of the Petition based upon a lack of information sufficient to justify a belief therein.

17.

The allegations of Paragraph 17 do not appear to require a response by Defendant, but to the extent such a response is required, Defendant denies the allegations of Paragraph 17 of the Petition based upon a lack of information sufficient to justify a belief therein.

18.

The allegations of Paragraph 18 do not appear to require a response by Defendant, but to the extent such a response is required, Defendant denies the allegations of Paragraph 18 of the Petition based upon a lack of information sufficient to justify a belief therein.

19.

The allegations of Paragraph 19 do not appear to require a response by Defendant, but to the extent such a response is required, Defendant denies the allegations of Paragraph 19 of the Petition based upon a lack of information sufficient to justify a belief therein.

WHEREFORE, Defendant, SKLARCO, L.L.C., prays that its Affirmative Defense and Answer be deemed good and sufficient, and after due proceedings are had, that there be Judgment herein in its favor and against Plaintiffs, dismissing this action with prejudice at Plaintiffs' cost.

DEFENDANT FURTHER PRAYS for all general and equitable relief.

Respectfully submitted,

BRADLEY MURCHISON KELLY & SHEA LLC

By: _____
　　　 Malcolm S. Murchison
　　　 Louisiana Bar Roll No. 9836

　　　 Stephen C. Fortson
　　　 Louisiana Bar Roll No. 28352

Tenth Floor, Louisiana Tower
401 Edwards Street, Suite 1000
Reception Ninth Floor
Shreveport, Louisiana 71101
Phone:　　　(318) 227-1131
Facsimile:　　(318) 227-1141

-- Attorneys for Sklarco, L.L.C.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing "Answer and Defense of

Sklarco, L.L.C." has this date been served upon all counsel of record by placing same in the

United States Mail, postage paid:

> Paul M. Adkins, Esq.
> Blanchard, Walker, O'Quin & Roberts
> 400 Chase Bank Tower, Suite 1400
> Shreveport, Louisiana 71101

Shreveport, Louisiana, this 16th day of February, 2011.

_____
OF COUNSEL

*Citation*

RETURN
SCANNED 02112011 0003

DICKSON, C BICKHAM III ETAL

VERSUS

SKLARCO LLC ETAL

NO. 547558-B
STATE OF LOUISIANA
PARISH OF CADDO
FIRST JUDICIAL DISTRICT COURT

THE STATE OF LOUISIANA:  TO  PETROHAWK PROPERTIES LP, THRU
NATIONAL REGISTERED AGENTS INC
1011 N CAUSEWAY BLVD, STE 3
MANDEVILLE LA 70471

of the Parish of ST TAMMANY

YOU HAVE BEEN SUED.
Attached to this Citation is a certified copy of the Petition.*  The
petition tells you what you are being sued for.

You must EITHER do what the petition asks, OR, within FIFTEEN (15) days
after you have received these documents, you must file an answer or other
legal pleadings in the Office of the Clerk of this Court at the Caddo
Parish Court House, 501 Texas Street, Room 103, Shreveport, Louisiana.

If you do not do what the petition asks, or if you do not file an answer
or legal pleading within FIFTEEN (15) days, a judgment may be entered
against you without further notice.

This Citation was issued by the Clerk of Court for Caddo Parish, on this
date January 27, 2011.

*Also attached are the following:
__ REQUEST FOR ADMISSIONS OF FACTS
__ INTERROGATORIES
__ REQUEST FOR PRODUCTION OF DOCUMENTS
__

GARY LOFTIN, CLERK OF COURT
MIKE SPENCE, CHIEF DEPUTY

By: _____
Deputy Clerk

JOHN ANDREW DURRETT    7158
Attorney

-----------------------------------------
SERVICE INFORMATION:                Date _____

Personal _____ Domi

Unserved _____ beca

Remarks _____

(05)547558 - 1.00 - C/P
Served PERS on
PETROHAWK PROPERTIES LP THRU NAT. REG.
AGENT at
1011 N Causeway BL, MANDEVILLE
Service Date & Time: 2/4/2011 11:08:00AM
THRU SECRETARY

3716 - BENITEZ, RICKY, St. Tammany Parish

FILED
SHERIFF RETURN

FEB 1 1 2011

GARY LOFTIN
CLERK OF COURT

RECEIVED
WASHINGTON-CIVIL

2011 FEB -2   A 11: 41

DUKEY J. STRAIN, JR.
SHERIFF

Rodney J. Strain, Jr.
Sheriff St. Tammany PARISH

Clerk of Court Caddo Parish
501 Texas Street, Room 103

**DISTRICT COURT**
FOR THE PARISH OF ST. TAMMANY

Shreveport, LA 71101

2/8/2011

Case: (09) 547558        C BICKHAM DICKSON, III, ET AL vs SKLEARCO LLC, ET AL

| Nbr | Date | Service Type | Charges |
|-----|------|-------------|---------|
| 1 | 02/02/2011 | Citation & Petition | $20.00 |

PETROHAWK PROPERTIES LP THRU NAT. REG. AGENT; 1011 N. Causeway BL.

Date of Disposition: 02/04/2011 Disposition Type: PERS
THRU SECRETARY

C/P

| 1 | 02/02/2011 | Mileage Charge | $9.60 |

Date of Disposition:  Disposition Type:

Case Total:        $29.60

Total:        $29.60

C/S

Please make check payable to:
Rodney J. Strain, Jr., Sheriff
701 N. Columbia St.
Covington, LA 70433

TO BE RETURNED WITH PAYMENT

*Citation*

DICKSON, C BICKHAM III ETAL

VERSUS

SKLARCO LLC ETAL

NO. 547558-B
STATE OF LOUISIANA
PARISH OF CADDO
FIRST JUDICIAL DISTRICT COURT

THE STATE OF LOUISIANA: TO SKLARCO LLC
THRU MALCOLM MURCHISON, AGENT
401 EDWARDS ST, STE 1000
SHREVEPORT LA 71101

of the Parish of CADDO

YOU HAVE BEEN SUED.
Attached to this Citation is a certified copy of the Petition.* The
petition tells you what you are being sued for.

You must EITHER do what the petition asks, OR, within FIFTEEN (15) days
after you have received these documents, you must file an answer or other
legal pleadings in the Office of the Clerk of this Court at the Caddo
Parish Court House, 501 Texas Street, Room 103, Shreveport, Louisiana.

If you do not do what the petition asks, or if you do not file an answer
or legal pleading within FIFTEEN (15) days, a judgment may be entered
against you without further notice.

This Citation was issued by the Clerk of Court for Caddo Parish, on this
date January 27, 2011.

*Also attached are the following:
___ REQUEST FOR ADMISSIONS OF FACTS
___ INTERROGATORIES
___ REQUEST FOR PRODUCTION OF DOCUMENTS
___

GARY LOFTIN, CLERK OF COURT
MIKE SPENCE, CHIEF DEPUTY

By: _____
Deputy Clerk

JOHN ANDREW DURRETT - 7158
Attorney

-------------------------------------------------------------------
SERVICE INFORMATION:                    Date  2-1-11

Personal  ✓  Domiciliary ____ to SKLARCO thru Malcolm
                                        Murchison

Unserved ____ because _____

Remarks _____


                    Deputy Sheriff

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

2011 JAN 28 A 11:41

SHERIFF'S OFFICE
CADDO PARISH

2502060

FILED
SHERIFF RETURN

FEB 0 2 2011

GARY LOFTIN
CLERK OF COURT