# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| C. BICKHAM DICKSON, III, ET AL | CIVIL ACTION NO. 5:11-cv-00352 |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| SKLARCO L.L.C. And PETROHAWK PROPERTIES, L.P. | MAGISTRATE JUDGE MARK HORNSBY |

## MEMORANDUM OPINION

Cross motions for summary judgment on the issue of the interpretation of the terms of two oil, gas and mineral leases are pending before the Court.  [Record Documents 32 and 34].  Plaintiffs, C. Bickham Dickson, III, James Scott Dickson, Denise Merrell Dickson, Michael Robert Dickson, Martha Ann Dickson Bigler, and Addie Smith Dickson (collectively "Plaintiffs"), claim in the underlying case that Defendant Petrohawk Properties, LP ("Petrohawk") violated the terms of two Oil, Gas and Mineral Leases by deducting post production costs, including transportation and gathering, from royalty payments due to Plaintiffs. In the motions before the Court, both parties claim that the contracts are unambiguous and this unambiguous language should be interpreted to render judgment in their respective favors.  For the reasons stated herein, the Court: 1) **DENIES** Plaintiffs' Motion for Partial Summary Judgment [Record Document 32]; and 2) **DENIES** Petrohawk's Motion for Summary Judgment [Record Document 34].

## I.    Factual and Procedural Background

The dispute between the parties centers around the terms of two Oil, Gas and Mineral Leases. Plaintiffs are owners and/or usufructuaries of approximately 1,385.52 acres in Caddo Parish, Louisiana.[1]  The Plaintiffs, and their predecessors in interest, granted a series of Oil, Gas and Mineral Leases to Sklarco L.L.C. ("Sklarco"), as sole lessee, dated September 1, 2005 and recorded December 14, 2005 in the Conveyance Records of Caddo Parish, Louisiana (the "Leases").[2] The Lessors on the Lease bearing Registry Number 2011891 (the "Dickson Family Lease") are Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson, and James Scott Dickson.[3] The second Lease, bearing Registry Number 2011893, was granted by C. Bickham Dickson, III (the "Bickham Dickson Lease").[4] The Leases are both on Bath forms, provide for three year primary terms, and contain identical post-production cost clauses.[5] The Exhibits "A" to the Leases provide the legal description of the property covered by the Leases, and the Exhibits "B" to the Leases provide additional provisions that are made a part of the Leases.[6]

---

[1] Record Document 32-2, p.2

[2] Id. , Record Document 34, p.1

[3] Record Document 34, p.1

[4] Id.

[5] Record Document 1, Exhibit 1 in globo.

[6] Id.

Sklarco and Petrohawk executed a Partial Sublease of Oil, Gas and Mineral Leases dated effective February 1, 2008, by which Petrohawk acquired the rights to the Leases to the depths from and below the Hosston Zone, Reservoir A, Cedar Grove Field, as defined by the Louisiana Office of Conservation Order No. 967, dated January 28, 1976.[7] Plaintiffs granted an Extension of Oil, Gas and Mineral Leases, dated effective July 1, 2008, recorded on August 8, 2008, under Registry Number 2176805 in the Conveyance Records of Caddo Parish, Louisiana, to Sklarco and Petrohawk, which extended the primary terms of the Leases until August 31, 2011. [8]

At dispute between the parties is the interpretation of one of the provisions contained in the Exhibits "B" to the Leases. Paragraph 7 of Exhibit "B" in the Dickson Family Lease and Paragraph 8 of Exhibit "B" in the Bickham Dickson Lease provide in full[9]:

> The parties agree that post production costs may be deducted from Lessor's share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under this Lease insofar and only insofar as such costs either enhance the value of the product being sold and the price obtained for such product or are required to make the product marketable. Without limitation upon the foregoing, the treating, processing or dehydrating of natural gas to meet pipeline quality specifications shall be deemed to enhance the value of the product being sold.

---

[7]Record Document 34, p.3

[8]Id.

[9]The addendum in Paragraph 7 and Paragraph 8 is identical, and shall be referenced herein as "Paragraph 8" for simplicity.

Plaintiffs and Petrohawk agree that after drilling several wells on the leased property, Sklarco paid royalties to Plaintiffs without any deductions.[10] The parties agree that Petrohawk paid royalties to the Plaintiffs without any deductions until approximately May 2010, at which time it began deducting gathering and transportation costs.[11]

Both Plaintiffs and Petrohawk argue that Paragraph 8 is unambiguous.[12] However, Plaintiffs believe that Paragraph 8 prohibits the deduction of gathering and transportation costs from their royalty payments under the Leases, and Petrohawk believes that it is allowed to reduce those costs from the royalty payment under the terms of the Leases.

## II. Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

---

[10]Document 32-2, p.4; Record Document 34-1, p. 2

[11]Document 32-2, p.5; Record Document 34-1, p. 6

[12] Record Document 32-2, p. 7; Record Document 34-1, p. 11.

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id., 477 U.S. at 322, 106 S. Ct. at 2552.  If the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the motion is properly made, however, Rule 56(c) requires the nonmovant to go "beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."[13] Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted). While the nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence, Little, 37 F.3d at 1075,  Wallace, 80 F.3d at 1047, all factual controversies must be resolved in favor of the nonmovant.  Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005).

As this case is before the Court under diversity jurisdiction, the Court must apply the substantive law of the forum state.  Bradley v. Allstate Ins. Co., 620 F.3d 509, 517 n.2 (5th Cir. 2010) (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)).  The Fifth

---

[13]Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried.  Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried."  All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule."  Local Rule 56.2.

Circuit in In re Katrina Canal Breaches Litigation stated the appropriate methodology for

a Federal Court sitting in diversity in Louisiana to apply:

> To determine Louisiana law, we look to the final decisions of the Louisiana Supreme
> Court.  In the absence of a final decision by the Louisiana Supreme Court, we must
> make an Erie guess and determine, in our best judgment, how that court would resolve
> the issue if presented with the same case.  In making an Erie guess, we must employ
> Louisiana's civilian methodology, whereby we first examine primary sources of law: the
> constitution, codes, and statutes. Jurisprudence, even when it rises to the level of
> jurisprudence constante, is a secondary law source in Louisiana.  Thus, although we
> will not disregard the decisions of Louisiana's intermediate courts unless we are
> convinced that the Louisiana Supreme Court would decide otherwise, we are not
> strictly bound by them.

495 F.3d 191, 206 (5th Cir. 2007) (citations and internal quotation marks omitted).

## III. Law and Analysis

At dispute between the parties is the interpretation of a provision in an

addendum to the Leases. "A mineral lease is a contract by which the lessee is granted

the right to explore for and produce minerals." La. Rev. Stat. Ann. §31:114 (2012).

Louisiana law provides that mineral leases are construed as leases generally and that

codal provisions that apply to ordinary leases are applied to mineral leases. Alyce

Gaines Johnson Special Trust v. El Paso E&P Co., L.P., 773 F.Supp.2d 640, 644 (W.D.

La. 2011); see also La. Rev. Stat. Ann. §31:2 (2012).

"Contracts have the effect of law for the parties" and the "[i]nterpretation

of a contract is the determination of the common intent of the parties." La. Civ. Code

Ann. arts. 1983 and 2045 (2012). "When the words of a contract are clear and explicit

and lead to no absurd consequences, no further interpretation may be made in search

of the parties' intent." La. Civ. Code Ann. art. 2046 (2012).  "When the language of a

contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document." <u>Tammariello Properties, Inc. v. Med. Realty Co., Inc.</u>, 549 So.2d 1259, 1263 (La. App. 3 Cir. 1989).

## A. Mineral Code Article 128

Although the bulk of the parties' arguments have to do with the interpretation of the Leases, Petrohawk has presented an argument that the Court finds is an issue of law. Petrohawk argues in its Motion for Summary Judgment and its Opposition to Plaintiffs' Motion for Partial Summary Judgment that it is a third party to the Leases. Petrohawk argues that as a third party, it is able to avail itself of the Public Records Doctrine and thus is not responsible for the "secret intent" between the original lessors and Sklarco.[14] The Plaintiffs argue that Petrohawk cannot be considered a third party to the Leases and the subsequent Sublease and Lease Extension because of the effect of Louisiana Mineral Code article 128 and Louisiana Civil Code article 3343.[15] As discussed in detail below, the Court finds that it cannot make a determination about the parties' intent based on the present record. However, the Court finds that the question of whether Petrohawk can be considered a third person in relation to the Leases is a question of law.

The Louisiana Civil Code defines a third person as "...a person who is not a party to or personally bound by an instrument." La. Civ. Code Ann. art. 3343 (2012).

---

[14]Record Document 34-1, p. 9-10; Record Document 36, p. 9

[15]Record Document 32-2, p.18; Record Document 37, p. 5

"A person who by contract assumes an obligation or is bound by contract to recognize a right is not a third person with respect to the obligation or right or to the instrument creating or establishing it." Id. The Louisiana Public Records Doctrine states that "[t]he rights and obligations established or created by the following written instruments are without effect as to a third person unless the instrument is registered by recording it in the appropriate mortgage or conveyance records pursuant to the records of this Title..." La. Civ. Code Ann. art. 3338 (2012). Petrohawk argues that it is a third party to the Leases under the Public Records Doctrine, and that Mineral Code Article 128 has no bearing on whether or not Petrohawk can be considered a third party to the Leases.[16] The Court disagrees.

Louisiana Mineral Code article 128 states that "to the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee's obligations." La. Rev. Stat. Ann. art 31:128. The Louisiana Second Circuit Court of Appeals examined the effect of Article 128 of the Mineral Code on sublessees in Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co., L.L.C. 63 So.3d 159 (La App 2 Cir. 2011). There, the landowner, Hoover, and Goodrich Petroleum entered into a contract that contained a "most favored nations clause", which stated that if Goodrich, its successors or assigns, leased land within a certain area for a greater royalty and/or bonus than that which was paid to Hoover, the difference in the prices must be paid to Hoover. Id. at

---

[16]Record Document 36, p.9

161-162. Goodrich assigned 50% of its interest in the Hoover lease to Chesapeake Louisiana, L.P., which later obtained oil, gas and mineral leases from landowners within the specified zone at a higher royalty percentage. Id. at 162. Hoover filed suit under the "most favored nations" clause, and Chesapeake argued that because the transfer between itself and Goodrich was a sublease, its actions did not trigger the clause. Id. at 163.

The court first noted that under Louisiana law, the obligations of the lessee created in a mineral lease are real, and not personal, obligations. Id. at 166. The court found that when these real rights are transferred to subsequent owners of the leasehold, Article 128 of the Mineral Code provides that the assignee or sublessee acquires the real rights and powers of the lessee. The court found that in effect, parties who were not in privity with the lessor nevertheless become obligated directly to the lessor for the lease obligations. Id. The court determined that Article 128 of the Mineral Code transferred real rights to a sublessee or assignee, effectively making that sublessee or assignee a co-owner of the leasehold interest. Id. at 167.

The court found that Chesapeake and Goodrich were "co-owners" of the mineral lease and any real obligation owed to the lessor by Goodrich were also owed to the lessor by the Chesapeake. Id. It specifically rejected the notion that the "most favored nations" clause imposed only a personal obligation on Goodrich, and that Chesapeake would have had to assume Goodrich's personal obligations in order to be liable under the clause. Id.

The Court finds this case instructive because Petrohawk seems to be arguing that it potentially owes less of a duty to the Plaintiffs than Sklarco because as a sublessee, it is a third party to the Leases. The court's finding in Hoover Tree Farm indicates that Petrohawk, as a sublessee, is a co-owner of the leasehold interest and to the extent it owns an interest in the leasehold, it is as obligated as Sklarco to the lessors. By definition, Petrohawk cannot be a third person to the Leases because it is a sublessee of the Leases. Article 128 of the Mineral Code imposes on a sublessee both real rights and direct obligations to a lessor. The Louisiana Civil Code states that a person "who by contract assumes an obligation or is bound by contract to recognize a right is not a third person with respect to...the instrument creating [the obligation]." La. Civ. Code Ann. art. 3343 (2012). Petrohawk assumed a direct obligation to the lessors of the Leases when it entered into the Sublease with Sklarco and cannot be considered a third party to the Leases as to the issues raised in this litigation.

**B. The Market Value Lease Provision**

Both Plaintiffs and Petrohawk argue that the language of Paragraph 8 is unambiguous, and as such, each argues that they are entitled to summary judgment based on their interpretations of the language of the contracts. The Court now turns to an examination of the four corners of the contract to determine whether it is unambiguous.

The Court finds that there are two provisions in the Leases which address the deduction of post-production costs from the lessors' royalties. The first provision

that addresses the deduction of post-production costs is located in Paragraph 4 of the

Bath form. It states:

> [t]he royalties to be paid by Lessee are...on gas, including casinghead
> gas, or other gaseous substance produced from said land and sold or used
> off the premises or for the extraction of gasoline or other products
> therefrom, the market value at the well of one-fifth (1/5) of the gas so
> sold or used, provided that on gas sold at the wells the royalty shall be
> one-fifth (1/5) of the amount realized from such sale...[17]

Louisiana jurisprudence is well settled with regards to the interpretation of

"market value" Leases, such as a Bath form lease. See Merritt v. Southwestern Electric

Power Co., 499 So.2d 210 (La. App. 2 Cir. 1986); Freeland v. Sun Oil Co., 277 F.2d 154

(5th Cir. 1960); Wall v. United Gas Public Service Co., 152 So. 561 (La. 1934). Louisiana

law applies a reconstruction approach to determine the market value of gas, beginning

with the gross proceeds of the sale of gas and then deducting any additional costs of

taking the gas from the wellhead (the point of production) to the point of sale. Merritt,

499 So.2d at 213. The court in Merritt found that compression costs could be deducted

from the lessors' royalty because the gas was useless and had no market value at the

wellhead until it could be moved into the gathering line by compression, and thus

because it increased the value of the gas from the wellhead to the point of production,

compression was a marketable expense that could be deducted from the royalty. Id.

> The United States Fifth Circuit Court of Appeal in Freeland, when
> construing Louisiana law regarding a royalty provision under a market
> value lease, stated:  ....in the analytical process of reconstructing a market
> value where none otherwise exists with sufficient definiteness, all
> increases in the ultimate sale value attributable to expenses incurred in

---

[17]Document 1, Exhibit 1 in globo.

transporting and processing the commodity must be deducted. The royalty owner shares in only what is left over... 277 F.2d 154, 159 (5th Cir. 1960).

The court in Merritt listed some of the various types of costs that constitute additional marketing expenses, which the lessee can properly reduce from the lessors' royalty payments, including transportation costs, separation costs, extraction costs, and processing costs. 499 So.2d at 214. In Culpepper v. EOG Resources, Inc., the court reiterated its statement that production is futile without distribution of the product, and accordingly, royalty is free of costs up to the point of production, while subsequently incurred costs are shared between the lessor and the lessee. 92 So.3d 1141, 1144 (La. App. 2 Cir. 2012). The court stated "the computation of royalty 'at the well' has been long-held by our courts to include deductions for post-production costs." Id.

This Court follows well-established jurisprudence when it determines that transportation and gathering costs are likely deductible from the lessors' royalty under the standard provision contained in the Bath form of the Leases.   If this were the only provision in the Leases that addressed the deduction of post-production costs, then the Court's inquiry would end here. However, the Leases include another provision which addresses the same issue.

**C. Interpretation of Paragraph 8**

The second provision within the Leases that addresses the deduction of post production costs from the lessors' royalty payments is Paragraph 8, which is located in the Exhibits "B" to the Leases[18]:

> The parties agree that **post production costs may be deducted** from Lessor's share of the proceeds from the sale of crude oil, natural gas or other minerals payable as royalty under this Lease **insofar and only insofar** as such costs either enhance the value of the product being sold and the price obtained for such product **or** are required to make the product marketable. **Without limitation upon the foregoing**, the treating, processing or dehydrating of natural gas to meet pipeline quality specifications shall be deemed to enhance the value of the product being sold (emphasis added).

The Exhibits "B" contain other provisions, including requirements regarding subleases, depth limitations and surface rights.[19] Each provision included in the Exhibits "B" is an amendment that alters and replaces a provision contained within the standard Bath form. It logically follows that Paragraph 8, which involves the deduction of post production costs, could likewise have been intended to alter the "market value" provision in the Bath form.

Plaintiffs argue that Paragraph 8 is unambiguous in prohibiting the deduction of gathering and transportation charges from the Plaintiffs' royalty payments.[25] The Court finds this argument unpersuasive. An examination of the language of Paragraph 8 begins with the statement that post production costs **can** be

---

[18]Record Document 1, Exhibit 1 in globo.

[19]Id.

[25]Record Document 32-2, pp. 7.

Page 13

deducted from the lessors' royalties, limited only by  the satisfaction of at least one part of a two part test. The Court interprets the first sentence of Paragraph 8 to mean that post production costs can be deducted from the lessors' royalties, as long as those costs either enhance the value of the product being sold and the price obtained for such product **or** are required to make the product marketable.

The next sentence of Paragraph 8 provides an example that satisfies the test. The court interprets this sentence to mean that the treatment, processing or dehydration of natural gas to meet pipeline quality specifications is a specific example of a post production cost that satisfies the test laid out in Paragraph 8. Plaintiffs argue that the Court should apply the principle of ejusdem generis, which is defined as a canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed, to this sentence.[26] The Plaintiffs urge the Court to find that the treatment example provided in Paragraph 8 was meant to limit potential costs applicable under the test set out in the first sentence to similar examples, which would not include gathering or transportation.[27]

The Court finds the principle of ejusdem generis to be inapplicable to Paragraph 8 because the sentence begins with the phrase "without limitation upon the foregoing...". The only persuasive interpretation of the second sentence is that the

---

[26]Record Document 32-2, p. 9.

[27]Id. at p. 11.

treatment of the gas is an example of a post production cost which will satisfy the Paragraph 8 test but that the example provided is not intended to limit any other potential costs that could also satisfy the test.

Petrohawk argues that Paragraph 8 is unambiguous in that it allows for the deduction of transportation and gathering costs from the Plaintiffs' royalties. The Court agrees that under its interpretation of Paragraph 8 alone, gathering and transportation costs could be deducted from royalty payments as long as those costs were shown to enhance the value of the product being sold and the price obtained for such product or if they are required to make the product marketable. But to so interpret this provision ignores that the purpose of the Exhibit "B", as stated above, is to alter the effect of the provisions of the form contract. Morever, the language of the provision is unclear. It is difficult to imagine what costs expended post production would not enhance the value of the product or make the product more marketable. Why, then, was this language added to the contract? At the very least, the placement of the provision Exhibit "B", as well as the language contained within it, raises issues of fact as to the parties' intent.

It is the responsibility of this Court, when faced with a dispute about a provision in a contract, to determine the intent of the parties. La Civ. Code Ann. art. 2045 (2012). Louisiana law requires that the Court examine the entirety of the documents in question, not just the disputed provision, in search of the parties' intent.

La. Civ. Code Ann. art. 2050 (2012).[28] The court in <u>KPW Associates v. S.S. Kresge Co.</u>

states that:

> [a] cardinal rule in the construction of contracts is that the contract must
> be viewed as a whole and, if possible, practical effect given to all of its
> parts, according to each the sense that results from the entire agreement
> so to avoid neutralizing or ignoring any of them or treating them as
> surplusage.
> 535 So.2d 1173, 1182-1183 (La. App. 2 Cir. 1988)(quoting <u>Lambert v.</u>
> <u>Maryland Casualty Co.,</u> 418 So.2d 553, 559-560 (La. 1983)).

As such, the Court must determine not only if the language of Paragraph 8 is

unambiguous but also whether the provision's placement in the Leases as a whole is

unambiguous.

      The Louisiana Supreme Court recently stated that "...the primary goal of

contract interpretation is to ascertain the intent of the parties. Since the parties actually

chose to add or modify the printed contract, the written terms presumably better reflect

their intention than those contained in a printed contract intended for general use."

<u>Clovelly Oil Co., L.L.C. v. Midstates Petroleum Co., L.L.C.</u>, No. 2012-C-2055, 2013 WL

1115296, at *7-*8 (La. March 19, 2013). However, the court notes that "...even where

a contract contains both printed and handwritten or typewritten terms, the contract

must still be interpreted as a whole, and the printed terms should be interpreted, if

possible, so as to give them effect and to harmonize them with the provisions that are

handwritten or typewritten." <u>Id.</u> at *8. Similarly, the court in <u>Noel v. Discus Oil Corp.,</u>

---

[28]"Each provision in a contract must be interpreted in light of the other provisions
so that each is given the meaning suggested by the contract as a whole." La. Civ. Code
Ann. art. 2050 (2013).

when interpreting an amendment to a lease that references conservation orders, stated that in that case "[t]he issue is not whether the contract on its face contains a reference to one order but not the other, but rather whether the parties to the contract intended to include one order and exclude the other, and for what purpose." 714 So.2d 105, 110 (La. App. 2 Cir. 1998).

In support of its argument that Paragraph 8 is unambiguous, Petrohawk states that "the analysis Louisiana courts use to determine whether a post-production cost is deductible under a market value lease is **virtually identical** to the test for deductibility set out in Paragraph 8 of the leases...(emphasis added)".[29] Petrohawk is correct in that this Court's interpretation of Paragraph 8, as discussed above, likely would not bar any post production costs that would be allowed under the Bath form provision.[26] However, the Court finds that when Paragraph 8 is read in concert with the rest of the language in the Leases, an ambiguity exists with regards to the parties' intent related to post production costs.

"A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties." La. Civ. Code. art. 2053 (2013). While parole evidence is generally inadmissible in the determination of parties' intent, when the terms of a contract are ambiguous, the court

---

[29]Record Document 34-1, p.18.

may look beyond the four corners of the document. <u>Alyce Gaines Johnson Special Trust</u>, 773 F.Supp.2d at 644. "Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless there is ambiguity in the written expression of the parties' common intent."  <u>Blanchard</u>, 755 So.2d at 381.

   The record reflects the following course of dealing between the parties with regards to post production costs. The Plaintiffs claim that Bickham Dickson, on behalf of the lessors, told their attorney that they did not want any deductions made from their royalty costs.[30] Plaintiffs claim the family attorney spoke to David Barlow, who represented Sklarco, who stated that if Sklarco needed to treat the gas in order to meet pipeline quality specifications, it ought to be able to deduct such costs from the royalty payments.[31] David Barlow drafted Paragraph 8, and the parties agreed to its inclusion in the Leases.[32] As noted above, the parties agree that Sklarco never deducted any costs from the Plaintiffs royalty payments. Petrohawk did not deduct costs from the Plaintiffs' royalties until May 2010, at which time it began deducting gathering and transportation costs. Petrohawk states that although it began paying royalties to the Plaintiffs in the summer of 2008, it was not until 2010 that its Tulsa office interpreted the Leases and began to make those deductions.[33] The Court notes that the course of

---

[30]Record Document 32-2, p.3.

[31]Record Document 32-2, p.4

[32]<u>Id.</u>

[33]Record Document 34-1, p. 6.

dealing between the parties as it exists in the record is unclear as to the parties' intent regarding post production costs, and as such, a genuine issue of material fact exists regarding their intent.

Plaintiffs and Petrohawk both argued in their respective Motions for Summary Judgment that the Leases are unambiguous.[34] While both parties also made abbreviated arguments in their Memorandums in Opposition to the Motions of Summary Judgment that the Court should rule in their favor even if it found the contract to be ambiguous, the Court finds that the evidence in the record is insufficient to establish the parties' intent and as such, there is a genuine issue as to a material fact.[35] For this reason, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment [Record Document 32] and **DENIES** Petrohawk's Motion for Summary Judgment [Record Document 34].

**IV.        Conclusion**

For the reasons given above, the Court makes the following rulings:

1)        Plaintiffs' Motion for Partial Summary Judgment [Record Document 32] is

         **DENIED**;

2)        Petrohawks' Motion for Summary Judgment [Record Document 34] is

         **DENIED.        Shreveport, April 29, 2013.**

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

---

[34]Record Documents 32 and 34.

[35]Record Documents 36 and 37.